JAMES SIMPSON ET AL

*vs.*

RICHMOND WORSTED SPINNING COMPANY ET AL.

Sagadahoc.    Opinion March 11, 1929.

*George W. Heselton, Fred F. Lawrence,* for complainant.
*Pulsifer & Ludden, J. E. Regan,* for Intervenor defendant.

SITTING: WILSON, C. J., PHILBROOK, DUNN, BARNES, BASSETT, PATTANGALL, JJ.

BASSETT, J. On appeal by an intervenor in proceedings in equity from the final decree of the sitting Justice denying his right to relief.

The original bill was brought by James Simpson against Alexander H. Haddon and Edward L. Smeeton, who are non-residents and have never submitted themselves to the jurisdiction of this court, and the Richmond Worsted Spinning Company, a Maine corporation formed in December, 1923, by Haddon and Smeeton and located at Richmond.

Haddon and Smeeton had conveyed to the corporation mill property which Simpson claimed had been assets of a partnership to carry on a yarn spinning business and which had been formed in August, 1921, by Haddon, Smeeton and himself and terminated by the first two in November, 1923. The controversy between them as to whether Simpson was a partner and as to the amount to which he was entitled had been conditionally settled by an agreement in writing dated November 20, 1923, by which Haddon and Smeeton agreed to pay Simpson in settlement $43,000 payable in three promissory notes of varying maturity. The last note of $16,500 due January 20, 1924, not having been paid and the agreement for adjustment having been broken, Simpson on March 30, 1925, brought this bill asking that Haddon and Smeeton and the corporation be adjudged liable for the unpaid note and the interest and, if not paid, that he be adjudged a partner in the business and an equitable owner of one-sixth interest in it, that Haddon and Smeeton be ordered to account to him and that the property of the corporation be charged with an equitable lien for the amount which should be found due him.

Pending these proceedings, Harry L. Pond on June 10, 1925, petitioned to intervene as plaintiff, alleging that he and Simpson on June 11, 1921, became equal co-owners of a sixty day option to purchase the mill property in Richmond, which had been conveyed to Haddon and Smeeton and by them to the corporation, under an oral agreement between him and Simpson that each would endeavor to sell the property and the option on it and divide the proceeds

equally; that the claims which Simpson sought to enforce in the bill arose out of the sale of the option by Simpson; and that he was entitled to an accounting by Simpson.

Pond was permitted to intervene as a party defendant and answer.

It appears from the final decree that the liability of the defendant corporation had been fixed in a former decree in accordance with which $18,760.50 and $97.39 costs of suit had been paid into court by the corporation in discharge of its obligation. The parties assented to it, have acted upon it, and the sitting Justice in his final decree recognized it as settling all controversies, excepting those between Pond and Simpson, and with the acquiescence of all parties within the jurisdiction of this court and affected by its decree.

Hearing was held on the issues raised by Pond's answer.

From the evidence, it appeared that Simpson, an experienced superintendent of textile manufacture, became in 1920 superintendent of a carpet mill in Roxbury, Massachusetts, where Pond was employed as checker in the wool house at a weekly wage of twenty-three dollars. Hearing rumors of the mill shutting down, Simpson and Pond began to consider engaging in a yarn spinning business themselves if they could raise the money therefor. Pond, who had formerly worked in a broker's office, thought he could raise it. The project was discussed considerably but their testimony differs as to what each had in mind for form of organization and their interests in it if established. The necessity of finding an available mill for any plan becoming manifest, Pond learned through mill brokers of a mill at Richmond, Maine. He and Simpson went there to examine it. On the way home, it was agreed that Pond should try to get from the brokers an option, and he arranged for a sixty day option dated June 11, 1921, for the purchase price of $20,000, of which $500 was to be paid on the delivery of the option. Simpson and Pond went together to the broker's office. Simpson paid the $500, and the option, in which both were named as the optionees and payors of the consideration, was executed by both and delivered to them. Simpson made no objection to the form of the option. After the option was obtained, they discussed what would be their business relations if they succeeded in financing their

project. Their versions differ. Simpson testified that he refused Pond's suggestion of "fifty-fifty" but agreed to allow him twenty per cent if he raised the money. Pond testified to an unconditional agreement that he would have fifty per cent of the profits of the mill. But there was undisputed testimony of a broker that during the option period, a tentative plan, which did not go through, was worked out by Simpson, Pond and the broker for organizing a corporation, to be financed by the sale of preferred stock, with common stock as a bonus, and to be controlled by a majority of the common stock, which was to be issued in equal shares to Simpson and Pond and chiefly for the option.

Pond tried to effect the financing but did not succeed. About two weeks before the option period expired, Simpson undertook to raise money.

On July 27 he met Haddon, whose possible interest in the plan Simpson had learned a few days before, and went with him to Richmond. Negotiations between Simpson, Haddon and Smeeton followed and resulted in a written agreement dated August 8, hereafter considered.

During these negotiations, Pond was informed by Simpson that he had a prospective customer but was not told any of the details, or asked to take any part, and did not take part.

On August 6 Simpson telephoned Pond that Haddon and Smeeton would not go through with any plan if another besides Simpson was a party and asked him to release his interest in the option. Their versions of what each said to the other differ. On August 8, before the written agreement was executed, both met Haddon and Smeeton. After Simpson had conferred alone with them, Pond was informed that Haddon and Smeeton would pay him $1,000 for a release and employ him. He agreed to sign the release and on November 15, after he had begun to work in the mill for a weekly compensation, was given a check for $1,000 by Haddon and Smeeton. Pond signed the release, which was as follows:

"I, Harry L. Pond, of Natick, Massachusetts, hereby acknowledge receipt of one thousand dollars ($1,000) paid me by Richmond Worsted Spinning Co. in recognition of the fact that I have transferred to them any rights I may have had

under a certain option by and between Bloomsburg Silk Mill, James Simpson and myself, dated June 11, 1921, and in consideration thereof I hereby release unto said Richmond Worsted Spinning Co. and the partners doing business under said name any and all claims and demands of any sort whatsoever which I now have or ever have had against said Richmond Worsted Spinning Co. or said partners, arising from any cause whatsoever up to the present time.

In Witness Whereof I have hereto set my hand and seal this 15th day of November, 1921."

Pond never saw, and Simpson told him nothing about, the written agreement. The option and the property covered by it were conveyed to Haddon and Smeeton. They agreed to refund to Simpson the $500 paid by him. Pond continued in their employment until October, 1922. He first learned of the terms of the agreement in November, 1923, from Haddon when it was terminated and Simpson left Richmond. Pond made a demand on Simpson for an accounting in December, 1923. The decision of the sitting Justice was as follows:

"Upon a careful examination of the evidence in this case I am of the opinion that the release . . . signed by Harry L. Pond, intervenor, bars him from any right to recover any part of the option for value thereof or any part of the receipts of the real estate or other property embraced within the terms of the option. However were it not for the legal bar effectuated by the said release, I think the evidence would fairly show that Pond was co-owner of the option with Simpson. A decree may be drawn in accordance with this finding."

The decree denied that Pond was equitably entitled to any part of the proceeds of the notes given to Simpson or of the money paid into court or to any accounting from Simpson. The case comes up on appeal from this decree.

*First.* Was Simpson a partner of the Richmond Worsted Spinning Company on November 15, 1921, when the release was given and therefore within its express terms?

The written agreement of August 8 was between Haddon and

Smeeton, co-partners of a partnership to be conducted under the name of the Richmond Worsted Spinning Company, parties of the first part, and Simpson, party of the second part. It recited that Simpson desired to enter the employ of the partnership and "had sold to the partnership certain assets owned or controlled by him" and provided that he should be employed at a monthly salary and "as additional compensation over and above said monthly salary" be credited at the end of each calendar year with one-sixth of the net profits, or debited with one-sixth of the deficit, for the year before deducting his compensation. Upon the termination of the agreement by either party, there should be paid to Simpson "in payment of the balance due him upon the assets sold to the partnership and as full payment of said additional compensation the sum of $40,000 plus any amounts standing to the credit of said party of the second part in said open account or minus any debit balance there may be in said open account."

Simpson did not become a partner by this agreement. It was an agreement for his employment as a superintendent.

The mere fact that Simpson was to share in the profits and losses did not necessarily constitute a partnership. *Dwinel* v. *Stone*, 30 Me., 384 ; *Bailey Company* v. *Darling*, 119 Me., 326, 330.

But the plaintiff alleged in his bill that on August 5 Haddon, Smeeton and he mutually agreed to engage in the business of spinning yarn and that it was the intention of the parties to form a partnership to carry on the business ; that on August 8, intending to reduce into written form the partnership contract so agreed on, the written agreement of August 8, copy of which was annexed and marked as Exhibit A, was jointly executed, but that it did not by mutual mistake fully incorporate or express the true intention of the parties because not clearly expressing the plaintiff's right to a full one-sixth interest in the capital and assets of the partnership ; that the insufficiency of the written agreement in this respect was afterwards recognized by Haddon and Smeeton in correspondence between them so as to make certain that the plaintiff should at all times be entitled to one-sixth interest in the property and assets of the partnership as well as to participate in the profits. All of these allegations were admitted in Pond's answer. The correspondence or other proof of the allegations was not offered. The defendant

therefore admitted that a parol agreement for a partnership was entered into on August 5, and put into written form by the agreement of August 8, and subsequently modified in writing to conform to the original parol agreement. We are bound by these admissions and must hold that Simpson was a member of the partnership.

*Second.* What were the interests of Pond and Simpson in the option?

The sitting Justice found that Pond was a co-owner of the option with Simpson. We think this is fairly supported by the evidence, and that they had acquired and were holding the option with the relation of joint adventurers, a doctrine which has become well recognized in American courts (33 C. J., 841, Sec. 2), and is now considered by this court for the first time.

Joint adventure has been defined as "an association of two or more persons to carry out a single business enterprise for profit." 2 Rowley's Modern Law of Partnership, Sec. 975; *Fletcher* v. *Fletcher*, 172 N. W., 436, 440 (Mich.) ; *Keiswetter* v. *Rubenstein*, 209 N. W., 154, 157 (Mich.) ; *Elliott* v. *Murphy Lumber Co.*, 244 Pac., 91, 93 (Or.) ; 4 Words & Phrases (Third Series), 587 ; as "a special combination of two or more persons where in some specific venture a profit is jointly sought without any actual partnership or corporate designation." Schouler's Pers. Prop. (5th Ed.), 167a; 33 C. J., 841; *Perry* v. *Morrison*, 247 Pac., 1004, 1006 (Okla.) ; *Champion* v. *D'Yarmett*, 293 S. W., 587 (Tex. Civ. App.) ; as "where persons embark on an undertaking without entering on the prosecution of the business as partners strictly but engage in a common enterprise for their mutual benefit." *Hey* v. *Duncan*, 13 Fed. (2nd), 794, 795 ; "To constitute a joint adventure two parties must combine their property, money, efforts, skill or knowledge in some common undertaking." *Wilson* v. *Maryland*, 189 N. W., 437 (Minn.).

Joint adventure is not identical with partnership but is so similar in its nature and in the contractual relations created thereby that the rights as between the adventurers are governed practically by the same rules that govern partnerships. 15 R. C. L., 500; Amer. and Eng. Ann. Cas., 1916 A, 1210, note.

It is a contractual relation. *National Surety Co.* v. *Winslow*,

173 N. W., 181 (Minn.) ; *J. E. Trouant etc. Co.* v. *Weitz Sons*, 191 N. W., 884 (Ia.). Whether the parties to a particular contract have created, as between themselves, the relation of joint adventurers or some other relation depends upon their actual intention, which is determined in accordance with the ordinary rules governing the interpretation and construction of contracts. 33 C. J., 845, Sec. 16. Such a contract need not be express; it may be implied from the conduct of the parties. 2 Rowley's Modern Law of Partnership, Sec. 976; *Jackson* v. *Hooper*, 74 Atl., 130 (N. J. Ch.) ; *Goss* v. *Lanin*, 152 N. W., 43 (Ia.) ; *Saunders* v. *McDonough*, 67 So., 591 (Ala.). The acts and conduct of the parties engaged in the accomplishment of the apparent purposes may speak above the expressed declarations of the parties to the contrary. *O. K. Boiler etc. Co.* v. *Minnetonka Lumber Co.*, 229 Pac., 1045 (Okla.).

As in cases of partnership, various tests are resorted to in cases of joint adventure to determine whether the parties so intended. One term of the contract or one aspect of the relationship can not be fastened on to the exclusion of other parts. The whole scope of the arrangement must be examined and each of its parts considered in relation to all the other parts to ascertain the real intent of the parties. *Rosenblum* v. *Springfield Prod. Brokerage Co.*, 243 Mass., 111, 116.

Furnishing of capital by the parties is not necessary. *VanTine* v. *Hilands*, 131 Fed., 124, 128 ; *Boqua* v. *Marshall*, 114 S. W., 714, 717. The mere fact that some pay all expenses or furnish all the money used does not exclude associates from sharing in profits. *Saunders* v. *McDonough*, supra ; *Streat* v. *Wolf*, 119 N. Y. S., 779 ; *Migel* v. *Hiler*, 136 N. Y. S., 969 ; Am. and Eng. Ann. Cas., 1916 A, 1213. But there must be some contribution by each co-adventurer of money or material or service, something promotive of the enter-prise. *Brewer* v. *Ewart*, 97 So., 910 (Ala.). Sharing of losses is not an essential. *Keiswetter* v. *Rubenstein*, supra, and cases cited ; *Jackson* v. *Hooper*, supra. Mere sharing of profits is not sufficient. *Atlas Realty Co.* v. *Galt*, 139 Atl., 285 (Md.).

But as by its nature joint adventure is a common undertaking or common enterprise for mutual benefit, there must be, as a general rule, community of interest and participation in the benefit or profits. *McDonough et al* v. *Bullock*, 2 Pearson (Pa. Eq.), 191 ;

*McDaniel* v. *State Fair*, 286 S. W., 513 (Tex.). Contribution of money, material or services, joint ownership or proprietary interest, or joint control over the subject matter of the adventure, or the manner in which it is to be carried out, sharing of losses, sharing of profits are evidence of the common enterprise.

In the instant case, it seems clear from the evidence that a joint adventure was intended by Simpson and Pond. They had a common purpose to establish a business in which each was to have some interest. It was not necessary that their respective interests and share in any profits or benefits be definitely settled. *Goss* v. *Lanin*, supra. They took and held jointly the interest in the property by means of which they hoped and intended to establish their enterprise. Pond contributed services to the acquisition of the option and tried to raise money to finance the undertaking. That he expected to share in the profits and that Simpson so understood and felt some obligation about it, are clearly shown.

*Third.* What were the relations between the joint adventurers and how did such relations affect the release?

The persons engaging in a joint adventure stand each to the other and within the scope of the enterprise in a fiduciary relation and each has the right to expect and to demand the utmost good faith in all that relates to the common interests. 33 C. J., 851, Sec. 36; 15 R. C. L., 501; *Jackson* v. *Hooper*, supra; *Hey* v. *Duncan*, supra; *Botsford* v. *VanRiper*, 110 Pac., 705 (Nev.).

Each member of the group owes to every other member the duty of fair, open, honest disclosure and no member by connivance, deceit or suppression of facts within the right or to the advantage of any other member to know can secure or accept secret profits, commissions or rebates to the disadvantage of others, and he holds gains acquired by his breach of faith for the common benefit of his associates in proportion to their respective interests. *Goldman* v. *Pryor*, 179 N. W., 673 (Wis.).

The law presumes that each of the parties to a joint adventure has an equal interest in the property purchased for its use, notwithstanding the inequality of their contribution to the purchase price or the fact that one or more of the parties may have contributed only his or their services; but this presumption is rebuttable by proof of an agreement between or amongst them fixing

their interest in unequal proportions. 33 C. J., 858, Sec. 56; *Botsford* v. *VanRiper*, supra, and cases cited.

The venture originally intended was not carried through and Pond had no part in the business which was established and therefore the proportionate parts of the completed venture were not determined. But up to the time that the option was conveyed to Haddon and Smeeton, it was held jointly by Simpson and Pond. The legal presumption of equal interest was supported by the evidence. There was no agreement fixing the interest in other than equal proportions.

It is clear from the evidence that the price for the option, agreed to be paid to Simpson as between him, Haddon and Smeeton and which eventually was paid to him, was $40,000. Simpson did not disclose this agreement. He was in duty bound to do so whether or not Pond asked for information. Pond was under no duty to cross examine. He had a right to rely on full disclosure in good faith by Simpson. Simpson's breach of duty was actionable fraud on his part. *Goldman* v. *Pryor*, supra; 33 C. J., 857. An equitable action for an accounting is a proper remedy of a party to a joint adventure to recover his share of the profits. 15 R. C. L., 507, Sec. 11.

We think it is clearly shown that Pond executed the release in ignorance of the facts, and would not have done so had he known them. It was not until two years after he had signed the release that he learned the facts and a month later demanded an accounting. The release therefore did not bar the action within the rules of *Barrett* v. *L. B. & B. St. Ry. Co.*, 110 Me., 24, 30; *Redman* v. *Bryant Company*, 125 Me., 183.

It was contended that the finding of the sitting Justice that the release was a bar necessarily implied an adverse finding on a claim of fraud. Even if that be so, we think that fraud within the principles of this decision is so clearly shown that a finding to the contrary could not be upheld.

Pond was therefore entitled to recover from Simpson one-half of the forty thousand dollars paid to Simpson for the option and of the interest on the notes given in payment. Pond was not entitled to recover any part of the profits of the partnership which may have been paid to Simpson since it does not appear that any definite agreement between them with reference to profits was made. Such

profits can not be held to be profits of the option or dividends thereon. Pond, contending that the agreement between Simpson, Haddon and Smeeton was only the written agreement of August 8, claimed that profits over and above his salary as superintendent were proceeds of the option. But Simpson was admittedly a partner and any profits he received can not be held to be necessarily proceeds of the option.

It does not appear from the evidence whether Simpson was reimbursed by Haddon and Smeeton for the $500 paid by him for the option, in accordance with their agreement with him as he testified. Nor does it clearly appear whether or not he and Pond considered the money was advanced by him as a loan to the venture. Money advanced by one party to a joint adventure is held to be a loan to the venture for which the party is entitled to be reimbursed out of the proceeds of the adventure, but such advance does not entitle the party, so doing, to any superior right against his co-adventurers. *Botsford* v. *VanRiper*, supra. If Simpson made an advance and was not reimbursed, he would be entitled to reimbursement of $500 from the proceeds of the option.

Pond was, on the foregoing principles, under obligation to pay to Simpson one-half of the thousand dollars received by him for his interest in the option.

The court below will determine the interest to be paid upon the foregoing amounts received at different times by Simpson and Pond as proceeds of the joint venture.

The mandate must therefore be

> *Appeal sustained.*
> *Decree reversed.*
> *Case remanded for proceedings*
> *in accordance with opinion.*