WALDO LUMBER COMPANY *vs.* FRED C. METCALF.

Penobscot.    Opinion, March 12, 1934.

*Ralph O. Brewster*, for plaintiff.
*Frank W. & Benjamin Butler*,
*C. N. Blanchard*, for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, THAXTER, HUDSON, JJ.

STURGIS, J. Action of assumpsit on account annexed with omnibus count attached. The plea is the general issue with a brief statement of special matters of defense. The case is reported for determination upon so much of the evidence as is legally admissible.

The action grows out of a hardwood lumber deal in which the plaintiff, the Waldo Lumber Company, a corporation having its principal place of business at Bangor, Maine, and Fred Wilkins, administrator of the estate of George W. Staples, formerly of Temple, Maine, were involved. In the summer and fall of 1928, Daniel F. Adams, a salesman for the Waldo Lumber Company, at the direction of Irving G. Stetson its general manager, negotiated for the purchase of a lot of hardwood lumber owned by the Staples estate, obtained an order from the Gem Crib & Cradle Co. of Gardiner, Mass., for more than 180 M feet of hardwood squares to

be sawed from the lumber, and arranged with the defendant in this action, Fred C. Metcalf, who operated a saw mill at West Farmington, Maine, to do the hauling, milling and loading. On November 4, 1928, Adams, signing for the Waldo Lumber Company as agent, but without authority, joined Wilkins, the administrator, in the execution of a written contract under seal in which it was agreed that the Company would purchase at a stated price all the lumber belonging to the Staples estate which was then on the sticks in Temple. On November 27, 1928, Metcalf began hauling the lumber from Temple, tallying it as it came in, and milling it to the specifications of the Gem Crib & Cradle Co. order. In all, 329,038 feet of lumber was hauled to the mill from Temple, and 20,000 feet was left on the sticks. Metcalf milled and shipped five carloads of the lumber to the Gem Crib & Cradle Co. on orders sent from the Waldo Lumber Company, which billed the shipments direct from its Bangor office and made the collections. On April 9, 1929, Metcalf, on orders from the Waldo Lumber Company, stopped milling. The lumber which had been hauled but was not milled was left in piles in or near Metcalf's mill yard.

The Waldo Lumber Company having refused to pay for the lumber, the administrator of the Staples estate brought suit against it and recovered a verdict of $5,481.64 in the Trial Court. On motion and exceptions brought to the Law Court, it was held that the evidence warranted a finding that the Waldo Lumber Company, through its general manager, with full knowledge of all material facts, took and retained a part of the benefits of the unauthorized contract which its salesman made and, having impliedly ratified the transaction in part, thereby bound itself for the entirety. The verdict was sustained. *Wilkins* v. *Lumber Company*, 130 Me., 5. The transcript of evidence in that case is, by stipulation, made a part of this record. The facts thus far recited are drawn from that transcript and the reported opinion and are the background of the instant action.

Here, the Waldo Lumber Company advances the claim that in purchasing this hardwood lumber from the Staples estate it was acting merely as the agent or broker of the defendant Fred C. Metcalf, and is therefore entitled to reimbursement from him for the entire expense of the transaction, a commission on the sale of the

lumber, the cost of the litigation with the original owner, and interest accrued, which altogether, according to its computations, amounts to $5,890.56. This is the basis of its declarations in its writ and the gist of its contentions throughout the brief. The claim is without merit. The general manager of the Waldo Lumber Company admits that he never talked with the defendant Metcalf about handling the lumber on a commission basis and there is no proof of such an arrangement elsewhere in the evidence. The record clearly indicates that the relation of principal and agent or broker did not exist between these parties.

The conclusion reached upon the primary issue in this case, however, does not necessarily determine the respective rights and liabilities of these litigants. There is evidence in the report which indicates that the defendant Metcalf and the Waldo Lumber Company may have entered into a joint adventure in which it was agreed that the profits and losses of the purchase and sale of the lumber in controversy should be shared equally after the payment to Metcalf of fixed and agreed prices for hauling, milling and loading, with allowances for customer's discounts, interest charges and insurance. Such a venture was undoubtedly proposed to Metcalf by the salesman Adams with the knowledge and consent of the general manager of the Waldo Lumber Company. Following repeated telephone conversations and an extended correspondence, Metcalf by letter of December 27, 1928, unqualifiedly offered to join the venture on the terms proposed, but whether the Waldo Lumber Company accepted this offer and obligated itself accordingly is a controverted question. Its general manager, on December 27, 1928, but before the receipt of the offer from Metcalf, had made a substantially similar but conditional proposal to him and the two counter-offers, written on the same day, passed each other in the mails. The Waldo Lumber Company acknowledged receipt of Metcalf's offer by letter of December 28, 1928, but without mention of its counter-offer or other reservation, and immediately set up and carried an account in the name of the joint adventurers on its books. We find no mention of this correspondence by Metcalf, either in his testimony or letters, but his subsequent conduct, as does that of the manager of the Waldo Lumber Company, permits the inference that from and after December 28, 1928, the parties

understood that they were engaged in a joint adventure and dealt with each other accordingly.

The state of accounts between these parties as a result of this lumber deal is admittedly uncertain and as yet undetermined. The Waldo Lumber Company credited its receipts from the shipments of lumber to the Gem Crib & Cradle Co. and charged its advances for hauling, loading, insurance and other expenses to the joint account. Metcalf collected moneys from the sale of waste, but his records of his receipts and disbursements are more or less incomplete and his statements of how much lumber he hauled and milled and the amount, if anything, now due him therefor are indefinite. It is claimed that a quantity of softwood lumber sold to Metcalf personally by the Staples estate was included in the judgment recovered against the Waldo Lumber Company in the former action and that Metcalf's hauling charges cover that as well as hardwood. Another and independent lumber transaction between the parties is involved in the accounts. Each party charges the other with responsibility for the abandonment of the milling operation and the order of the Gem Crib & Cradle Co. and the losses which resulted. Apparently an accounting is necessary. This can be had only in equity. An equitable action for an accounting is the proper remedy of a party to a joint adventure to recover his share of the profits or fix the liability for losses. *Simpson* v. *Spinning Company*, 128 Me., 22, 32; 15 R. C. L., 507; 33 C. J., 867 and cases cited.

The issues here raised are not the same as those which were tried or might have been tried in the former action of *Wilkins* v. *Lumber Company*, supra. The judgment there entered is not a bar to an accounting between the parties to this action. Except as to the claim of the plaintiff that it was the defendant's agent or broker, which we here decide can not be sustained, on the case brought forward it appears that the rights of the parties can be better determined and enforced by a judgment and decree in equity. The uncertainty and incompleteness of the record does not permit that determination here, as in *Savings Bank* v. *Hurley*, 117 Me., 211, 215. The case falls within the statute authorizing the Law Court to transfer an action at law commenced in the Superior Court to the equity docket for the county in which it originated, there to be heard and determined in equity. R. S., Chap. 96, Sec. 17.

The pleadings at law are to be struck out. The parties must plead anew in equity in the same cause, and the action will stand transferred to the equity docket for the County of Penobscot, there to be heard and determined in equity. The costs of this suit at law, including the report of the case to the Law Court, will be charged against this plaintiff in the final decree.

*So ordered.*