**HONEYCOMB SYSTEMS, INC.,**
**Plaintiff,**

v.

**ADMIRAL INSURANCE COMPANY,**
**Defendant.**

**Civ. No. 80–0439 P.**

United States District Court,
D. Maine.

July 21, 1983.

Harrison L. Richardson, John S. Whitman, Richardson, Tyler & Troubh, Portland, Me., for plaintiff.

Charles W. Craven, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, Pa., Gerald F .Petruccelli, Portland, Me., for defendant.

## MEMORANDUM OF OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

In this declaratory judgment action plaintiff Honeycomb Systems, Inc. ["Honeycomb"] seeks a judgment declaring that certain losses it sustained arising from the 1977 failure of a dryer built by it for Scott Paper Company ["Scott"] are covered by an umbrella liability insurance policy issued to it by defendant Admiral Insurance Company ["Admiral"]. The case is submitted on stipulated facts and cross-motions for summary judgment. The issues have been thoroughly briefed and argued. For the reasons to be stated, Honeycomb's motion for summary judgment is granted and Admiral's motion for summary judgment is denied.

## I.

### The Stipulated Facts

Honeycomb manufactures, among other products, large dryers that are widely used

by paper manufacturers. In the early 1970s Scott, a major manufacturer of paper products, decided to build a new paper machine capable of producing a premium brand of toilet paper. In 1973 two of the senior members of Scott's engineering staff met with Honeycomb's chief engineers to discuss the feasibility of Honeycomb building a dryer with a diameter of 22 feet for incorporation into the new paper machine. Prior to that time the largest dryer ever manufactured by Honeycomb was 12 feet in diameter. Scott and Honeycomb agreed that Honeycomb would perform a feasibility study, the cost of which would be applied to the cost of the new dryer if Scott ordered it. Because proper performance and evaluation of the feasibility study required Scott and Honeycomb to disclose to each other confidential aspects of their respective businesses, they executed an agreement that prohibited disclosure to third parties of each others' trade secrets and that prohibited Honeycomb, for a fixed period of years, from selling to Scott's competitors dryers with diameters greater than 14 feet.

By late 1973 Scott and Honeycomb concluded that the project was feasible, and in November 1973 Scott directed Honeycomb to design and build a 22 foot dryer according to design and operating guidelines provided by Scott. Honeycomb itself designed the dryer and fabricated the "shell," the cylindrical portion of the dryer. It hired Hodge Boiler Works, Inc. ["Hodge"], a well-established firm with long experience in heavy welding and fabrication, to fabricate the "heads," the large circular plates that hold the cylindrical portion of the dryer at each end. In late 1974 the various parts of the dryer were shipped to Scott's plant in Chester, Pennsylvania, where they were assembled and incorporated in the new paper machine. The paper machine was put into operation in May 1975.

In September 1975 Scott inspected the dryer and found that most of the welds around the hub of the front dryer head had failed and that the welds on the back dryer head showed signs of inadequate weld size and quality. The cause of the problem was that Hodge had applied welds that were grossly undersized and of such poor quality that they did not even come close to minimum standards. The dryer was shut down for repair of the welds from September 6 to November 7, 1975. During that time Scott and Honeycomb discovered two other fabrication errors by Hodge affecting the hubs. In boring out the hubs Hodge had bored deeper than specified. In addition, Hodge had erroneously attached a ¾-inch plate closer to the outer end of the flanges on the head than the drawing called for. These two errors greatly increased the stress at the base of the hub flanges.

Scott and Honeycomb each had engineers study the boring and attachment errors to determine whether the errors would significantly impair the integrity of the hub. Each engineer independently concluded that the magnitude of the stress created by these errors was so low as to cause no concern. Honeycomb, however, suggested that Scott continue to monitor the problem using strain gauges.

For two years Scott regularly inspected the welds and monitored the performance of the heads without discovering any problem of significance. The monitoring took the form of visual inspection and, on occasion, the use of x-rays and liquid dye penetrant to detect cracks. It is unclear whether Scott followed Honeycomb's suggestion to use strain gauges. On September 3, 1977, during the routine Labor Day shutdown, Scott discovered a substantial crack in the hub of the back head. The cause of the hub crack was Hodge's boring and attachment errors; it had nothing to do with welding, which had been the cause of the 1975 failure. The crack was a very serious flaw, extending about 35 inches, or through 40% of the hub's circumference. If left unrepaired, the crack would have worsened and caused a severe failure of the dryer. Consequently, Scott shut the machine down until repairs were made, a period of 40 days.

Throughout the period from 1975 through 1978 Honeycomb's primary liability insurer was The Hartford Insurance Co. ["Hartford"]. The Hartford policy afforded property damage liability coverage of $100,000 for each occurrence. At the time of the 1975 failure of the welds, Honeycomb also had an excess ("umbrella") liability policy issued by Aetna Insurance Company ["Aetna"], effective from September 21, 1972 to September 21, 1975. The Aetna policy afforded property damage liability coverage of $2,000,000 for each occurrence, in excess of the Hartford coverage. From September 21, 1975 through July 1, 1977, Federal Insurance Company was the excess liability insurer, providing the same coverage. That policy was succeeded by Admiral's umbrella liability policy, effective from July 1, 1977 to July 1, 1978. Admiral's policy provided $1,000,000 property damage liability coverage for each occurrence, in excess of $100,000.

On September 1, 1978, Scott sued Honeycomb and Hodge in this Court. *See Scott Paper Company v. Honeycomb Systems, Inc.,* Civ. No. 78–177 P (D.Me. filed Sept. 1, 1978). The suit sought recovery of three major elements of damages: the "direct cost" of repairing the 22 foot heads in 1975 and 1977, the lost profits attributable to the interruption of production during each repair period, and the costs of constructing replacement heads. The total claim for damages exceeded $28,000,000.

On September 18, 1981 the Scott suit was settled when Hartford and Aetna between them paid Scott $1,000,000, Honeycomb paid Scott the equivalent of $741,000 in cash by forgiving two Scott debts to Honeycomb, and Honeycomb gave Scott a promissory note for $250,000, payable in three annual installments beginning September 18, 1982, with interest at 8% per year. The

parties have stipulated that the $250,000 promissory note represents the amount of the settlement for which Admiral will be liable in this action if Honeycomb establishes that Honeycomb's policy with Admiral covers any *one* of the three categories of damages sued for by Scott. The parties have also stipulated that the Court is to add to any award interest on the $250,000 from September 18, 1981, to be computed at a rate of 8% per year, without compounding. Honeycomb also seeks to recover the attorney's fees incurred in bringing this action.

## II.

### Discussion

The parties agree that the present lawsuit is governed by the terms of the umbrella liability policy issued to Honeycomb by Admiral, effective from July 1, 1977 to July 1, 1978. The policy is a standard form comprehensive general liability (CGL) policy.[1] The policy provides that Admiral will indemnify Honeycomb for losses sustained by Honeycomb in excess of $100,000 that Honeycomb is

legally obligated to pay as damages because of ... property damage ... to which this insurance applies, caused by an occurrence anywhere during the policy period.

Admiral disclaims coverage of the 1977 failure on four grounds. Admiral contends (1) that the 1977 hub crack in the dryer did not constitute an "occurrence" within the meaning of the policy, (2) that any "occurrence" that did take place "occurred" before July 1, 1977, (3) that the damages suffered by Honeycomb as a result of the crack do not constitute "damages because of property damage to which this insurance applies," and (4) that the damages suffered by Honeycomb fall within several of the

[1.] The policy in issue here is the fifth generation of a standard form contract that was first promulgated in 1940 and that underwent major revisions in 1943, 1955, 1966 and 1973, *Weedo v. Stone-E-Brick, Inc.,* 81 N.J. 233, 405 A.2d 788, 791 (1979); Tinker, *Comprehensive General Liability Insurance—Perspective and Overview,* 25 Fed'n Ins. Counsel Q. 217, 221 (1975). Provisions in this policy and provisions similar thereto have seen considerable judicial and academic scrutiny.

exclusions specified in the policy. The Court finds none of these arguments persuasive.[2]

## A. *"Occurrence"*

The Admiral insurance policy defines an "occurrence" as

an accident, including continuous or repeated exposure to conditions, which results in ... property damage ... neither expected nor intended from the standpoint of the insured.

Admiral does not argue that the crack was other than an unintended accident that resulted in property damage.[3] Admiral contends, however, that the 1977 hub crack was "expected from the standpoint of the insured."

Admiral argues that the Court must employ an objective test in determining whether something is "expected." The Supreme Judicial Court of Maine, however, has recently considered and explicitly rejected the contention that application of an objective test is required by the phrase "expected ... from the standpoint of the insured." In *Patrons-Oxford Mutual Insurance Co. v. Dodge,* 426 A.2d 888, 892 (Me. 1981), the court interpreted the phrase as referring only to injury that the insured "in fact *subjectively foresaw as practically certain.*" (emphasis in original). *Accord City of Virginia Beach v. Aetna Casualty &*

*Surety Co.,* 426 F.Supp. 821, 824–25 (E.D. Va.1976). The record offers no support for the contention that Honeycomb actually foresaw a great likelihood of the crack, and, indeed, Admiral makes no such suggestion. Admiral's argument that the crack was expected therefore fails.

Although the Court perceives no meaningful way to distinguish *Dodge,* even were the Court to adopt an objective standard, defendant's argument would fail. In urging an objective test, Admiral initially suggests that any "reasonably foreseeable" event must be considered expected, citing *Gassaway v. Travelers Insurance Co.,* 222 Tenn. 649, 439 S.W.2d 605, 608–09 (1969). Alternatively, Admiral suggests that the Court adopt the objective test expressed in *City of Carter Lake v. Aetna Casualty & Surety Co.,* 604 F.2d 1052, 1058–59 (8th Cir.1979), which bars recovery for an event if the insured "knew or should have known that there was a substantial probability" of the accident occurring. The *Gassaway* "reasonably foreseeable" test clearly is an erroneous one. Such a test would allow coverage only when the insured is not negligent and hence generally not in need of liability coverage, while the test would disallow coverage when the insured is negligent and hence in need of coverage. As the Eighth Circuit has noted, unless one assumes that insurance companies exist for

---

2. The parties have stipulated that Maine law is the applicable law. As the Maine courts have not interpreted most of the provisions contained in the policy, the Court has had resort to accepted canons of interpretation of insurance contracts, among which are the canon that ambiguity in an insurance contract is to be construed against the insurer, *Baybutt Construction Corp. v. Commercial Union Insurance Co.,* 455 A.2d 914, 921 (Me.1983); *Farm Bureau Mutual Insurance Co. v. Waugh,* 159 Me. 115, 188 A.2d 889 (1963), and its corollary that exclusions from coverage are to be narrowly construed, *Baybutt Construction Corp., supra,* 455 A.2d at 921; *Travelers Indemnity Co. v. Dingwell,* 414 A.2d 220, 228 (Me.1980). In addition, the Court has referred to decisions in other jurisdictions and the writings of commentators concerning policies similar to the one at issue here.

3. In passing, Admiral cites two cases that hold that an event that is the result of cumulative effects of exposure to a condition is not an "accident." *See Leggett v. Home Indemnity Co.,* 461 F.2d 257 (10th Cir.1972); *A.D. Irwin Investments, Inc. v. Great American Insurance Co.,* 28 Colo.App. 570, 475 P.2d 633 (1970). Those cases appear to consider pre-1966 CGL policies, which did not contain the phrase "including continuous or repeated exposure to conditions" as part of their definitions of accident. Consequently Admiral quite properly refrains from arguing that these cases control here.

Though Admiral does not dispute the allegation that the accident resulted in property damage, Admiral does contend that the accident did not result in property damage covered by the policy. That contention is examined in section C *post.*

the sole purpose of receiving premiums, such a construction makes no sense. *City of Carter Lake, supra,* 604 F.2d at 1058. *See* M. Rhodes, *Couch on Insurance 2d* §§ 44:267, 44:285 (Rev.Ed.1982) (citing cases that hold that the negligence of the insured does not vitiate insurance coverage).

■ In addition, defendant simply cannot meet the "substantial probability" test announced in *City of Carter Lake.* That test requires a higher degree of expectability than the "reasonably foreseeable" test:

> A result is reasonably foreseeable if there are indications which would lead a reasonably prudent man to know that the particular results could follow from his acts. Substantial probability is more than this. The indications must be strong enough to alert a reasonably prudent man not only to the possibility of the results occurring but the indications also must be sufficient to forewarn him that the results are highly likely to occur.

*City of Carter Lake, supra,* 604 F.2d at 1059 n. 4. In *Carter Lake* the insured suffered equipment failure of a type that clearly indicated a substantial probability of the identical failure recurring. The Court held that five recurrences of the incident during the year subsequent to the original failure were not "unexpected," and hence not covered by the insurance policy. *See also United States Fidelity & Guaranty Co. v. Bonitz Insulation Co. of Alabama,* 424 So.2d 569, 572 (Ala.1982). In this case, by contrast, there was no prior occurrence of the hub crack. Scott and Honeycomb merely discovered deviations from fabrication plans, deviations that engineers for each company independently concluded were no cause for concern. Nothing in the record would permit the Court to find that prior to September 3, 1977 Honeycomb faced indications sufficient to forewarn it that the crack was "highly likely to occur."

B. *"During the Policy Period"*

The Admiral policy provides coverage for "... property damage ... caused by an occurrence anywhere during the policy period." Admiral contends that the 1975 failure and the 1977 hub crack constituted but one occurrence, an occurrence that happened in 1975, outside the Admiral policy period.

■ The general rule is that an occurrence happens when the injurious effects of the occurrence become "apparent," or "manifest themselves." *Appalachian Insurance Co. v. Liberty Mutual Insurance Co.,* 676 F.2d 56, 60 n. 10, 61–62 (3d Cir.1982) (Massachusetts law in accord with general rule); *Bartholomew v. Appalachian Insurance Co.,* 655 F.2d 27 (1st Cir.1981) (Rhode Island law in accord with general rule). *See, e.g., Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co.,* 682 F.2d 12, 19 (1st Cir.1982); *American Motorists Insurance Co. v. Trane Co.,* 544 F.Supp. 669, 681 (W.D.Wis.1982), and cases there cited; *Bartholomew v. Insurance Co. of North America,* 502 F.Supp. 246, 252–54 (D.R.I. 1980), *aff'd sub nom., Bartholomew v. Appalachian Insurance Co.,* 655 F.2d 27 (1st Cir.1981), and cases there cited; *United States Fidelity & Guaranty Co. v. American Insurance Co.,* 169 Ind.App. 1, 345 N.E.2d 267, 270 (1976). The determination of whether there were multiple occurrences or simply multiple injuries resulting from a single occurrence is made by reference to the *cause* of injury. *Appalachian Insurance Co. v. Liberty Mutual Insurance Co., supra,* 676 F.2d at 61 (citing cases); *American Motorists Insurance Co. v. Trane, supra,* 544 F.Supp. at 680. Under this "cause" test the Court asks if there was "but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage." *Appalachian Insurance Co., supra,* 676 F.2d at 61 (quoting *Bartholomew v. Insurance Co. of North America, supra,* 502 F.Supp. at 251); *American Motorists Insurance Co., supra,* 544 F.Supp. at 680 (quoting *Olsen v. Moore,* 56 Wis.2d 340, 202 N.W.2d 236, 239 (1972), which, in turn, quotes *Truck Insurance Exchange v. Rohde,* 49 Wash.2d 465, 303 P.2d 659, 662 (Wash.1956)). If so, there

is but one occurrence; if not, there are multiple occurrences.

■ Admiral's argument is that damage first manifested itself, and hence the occurrence happened, in 1975 when the damage from the *welding* error first manifested itself. In making this argument Admiral conceptualizes the 1977 failure sued upon here as a second injury resulting from the same occurrence that caused the 1975 welding failure, not as the manifestation of a separate occurrence. The Court cannot agree. The Court is persuaded that the 1975 and 1977 failures must be viewed as separate occurrences. The 1975 failure was a breakdown in welds in the front head caused by faulty welding. The 1977 failure was not a recurrence of the 1975 failure, but rather a crack in the back head caused by a failure to follow the design in boring out the hub and affixing the hub plate. It had nothing to do with welding. Thus in no meaningful sense can the failures be said to have the same proximate cause.[4]

C. *"Damages Because of Property Damage to Which This Insurance Applies"*

The Admiral policy provides coverage for ... "property damage ... to which this insurance applies." Admiral argues that there was no property damage to which the policy applies. Close scrutiny of Admiral's argument makes clear that it is that certain provisions of the policy, namely exclusions (c), (d), (g), and (k), expressly exclude from coverage the damages suffered in the instant case. *See generally Tinker, supra,* at 233–34 (phrase "to which this insurance applies" is designed to incorporate by reference the exclusions specified in the policy). It is to that argument that the Court now turns.

*Exclusion (c).* Exclusion (c) states that the policy does not apply

to damages claimed for the withdrawal, inspection, repair, replacement or loss of use of the Insured's products or work completed by or for the Insured, or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein[.]

On its face this exclusion might seem applicable to the 1977 failure, since it speaks of the withdrawal of the insured's product from use because of a known defect. The history and purpose of the exclusion reveal, however, that it has no applicability in the present case.

■ Exclusion (c) is called the "sistership" exclusion. The purpose of the exclusion has been explained as follows:

The recall of equipment or parts discovered to have a common fault involves expenses incurred to prevent accidents which have not occurred. While the insurance covers damages for bodily injuries and property damage caused by the product that failed, it was never intended that the insurer would be saddled with the cost of preventing *other* failures ....

3 R. Long, Law of Liability Insurance, app. B, § 15 (1981) (emphasis supplied). In other words, exclusion (c) is designed to limit the insurer's exposure in cases where, because of the actual failure of the insured's product, similar products are withdrawn from use to prevent the failure of these other products, which have not yet failed but are suspected of containing the same defect. *See, e.g., Todd Shipyards Corp. v. Turbine Service, Inc.,* 674 F.2d 401, 419 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982); *Bigelow-Liptak Corp. v. Continental Insurance Co.,* 417 F.Supp. 1276, 1281–82 (E.D.Mich.1976); *Arcos Corporation v. American Mutual Liability Insurance Co.,* 350 F.Supp. 380, 384–

---

**4.** The analysis is not changed by the fact that Admiral has conceived of a category into which the causes of both failures can be placed, i.e., "fabrication errors by Hodge." One can always conceive of some category that encompasses two causal events, no matter how different the events may be.

85 & n. 2 (E.D.Pa.1972), *aff'd in part and dismissed and remanded in part without published opinion*, 485 F.2d 678 (3d Cir. 1973); *Yakima Cement Products Co. v. Great American Insurance Co.*, 22 Wash. App. 536, 590 P.2d 371, 374 (1979); *Ohio Casualty Insurance Co. v. Terrace Enterprises, Inc.*, 260 N.W.2d 450, 455 (Minn. 1977); *Gulf Insurance Co. v. Parker Products, Inc.*, 498 S.W.2d 676, 678 (Tex.1973); 3 R. Long, *supra*, at app. B, § 15. The exclusion does not apply to the product that failed, only to the "sister" products. *E.g., Bigelow-Liptak Corp., supra,* 417 F.Supp. at 1282; *Arcos Corp., supra,* 350 F.Supp. at 385; *Terrace Enterprises, Inc., supra,* 260 N.W. at 455; *Parker Products, Inc., supra,* 498 S.W.2d at 678–79. It has no application in the present context.

*Exclusion (d).* Exclusion (d) states that the policy does not apply

> to loss of use of tangible property which has not been physically injured or destroyed, resulting from:
>
> (1) a delay in or lack of performance by or on behalf of the Insured of any contract or agreement, or,
>
> (2) the failure of the Insured's products or work performed by or on behalf of the Insured to meet the level of performance, quality, fitness or durability warranted or represented by the Named Insured;
>
> but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the Insured's products or work performed by or on behalf of the Insured after such products or work have been put to use by any person or organization other than an Insured[.]

Several courts have held this exclusion inapplicable where the insured's product had been incorporated into another structure. *E.g., Int'l Hormones, Inc. v. Safeco Insurance Co.*, 57 A.D.2d 857, 394 N.Y.S.2d 260 (2d Dept.1977). Adoption of the holdings of these courts would dispose of Admiral's con-

tention that exclusion (d) excludes coverage here. But Admiral's argument fails for a more fundamental reason.

This exclusion distinguishes between a physical breakdown of the insured's product and a mere failure of the product to perform as well as warranted, presumably because the latter is a typical business risk whereas the former is more likely to have catastrophic consequences. One commentator illustrates the distinction as follows:

> A boiler sold and installed by the insured in a manufacturing plant fails to heat a quantity of water to the specified temperature, and the plant's capacity is thereby reduced. There would be no coverage for the resulting loss. However, if the boiler suddenly and accidentally breaks down, or explodes, without causing physical damage to other property, the loss of use of the plant would be covered.

Defense Research Institute, *Annotated Comprehensive General Liability Insurance Policy* 50 (1979).

 It is clear that in no meaningful sense can the crack through 40% of the circumference of the dryer hub be viewed as a mere failure to perform as well as warranted. Admiral's contention that exclusion (d) excludes coverage is therefore rejected.

*Exclusion (g).* Exclusion (g) states that the policy does not apply

> to property damage to (1) property owned by any Insured, (2) the Named Insured's products arising out of such products or any part of such products, or (3) work performed by or on behalf of the Named Insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith[.]

"Property damage" is defined by the policy to include both "physical injury to or destruction of tangible property" and "the loss of use thereof." Admiral does not claim that exclusion (g)(1) is applicable, since Scott and not Honeycomb was the

owner of the dryer. Admiral's contention is that the plain terms of exclusions (g)(2) and (3) encompass all aspects of the damages claimed by Scott, since it is undisputed that the 22-foot dryer is Honeycomb's "product" or "work performed by or on behalf of" Honeycomb. Admiral points out that it was the dryer alone, particularly its heads, and no other tangible property, that sustained physical injury in this case.

■ Neither the plain language nor the history and purpose of exclusions (g)(2) and (3) support Admiral's position. These exclusions in terms preclude coverage of property damage to the *insured's* products or work. As Honeycomb concedes, they may exclude coverage of damages claimed for the repair and replacement of the heads. But a significant element of the damages sued upon here is for loss of use of the paper machine, a product owned by Scott, not by Honeycomb. In other words, in its loss of use claim Honeycomb seeks recovery of damages to Scott resulting from a breakdown of Honeycomb's product; Honeycomb is not seeking to recover the damages to its own product, the dryer. The claim for loss of use of the paper machine is therefore not barred by the language of exclusions (g)(2) and (3). *See Baybutt Construction Corp. v. Commercial Union Insurance Co., supra,* 455 A.2d at 923 (Wathen, J., dissenting). *Accord Eastern Foundation Co. v. Creswell,* 475 F.2d 351, 354 (D.C.Cir.1973) and cases there cited; *United States Fidelity & Guaranty Co. v. Bonitz Insulation Co., supra,* 424 So.2d at 573–74.

The history and purpose of exclusions (g)(2) and (3), like their language, make clear that they simply exclude coverage for property damage to the insured's own product or work, in this instance the 22-foot dryer. These exclusions, like several others, are designed to make the insured responsible for predictable and limited business risks, while protecting the insured against catastrophe.[5] Thus in numerous cases courts have held that identical or substantially similar provisions do not exclude coverage for damages other than the costs of repair, replacement, or loss of use of the insured's product itself. *E.g., Todd Shipyards Corp. v. Turbine Service, Inc., supra,* 674 F.2d at 420–22; *Goodyear Rubber & Supply Co. v. Great American Insurance Co.,* 471 F.2d 1343 (9th Cir.1973); *Western Casualty & Surety Co. v. Polar Panel Co.,* 457 F.2d 957, 960 (8th Cir.1972); *Pittsburgh Bridge & Iron Works v. Liberty Mutual Insurance Co.,* 444 F.2d 1286 (3d Cir.1971); *St. Paul Fire & Marine Insurance Co. v. Northern Grain Co.,* 365 F.2d 361, 365–66 (8th Cir.1966); *Oliver B. Cannon & Son, Inc. v. Fidelity & Casualty Co.,* 484 F.Supp. 1375, 1383 (D.Del.1980); *United States Fidelity & Guaranty Co. v. Bonitz Insulation Co., supra,* 424 So.2d at 573–74; *Ohio Casualty Insurance Co. v. Terrace Enterprises, Inc., supra,* 260 N.W.2d at 454–55; *Safeco Insurance Co. v. Munroe,* 165 Mont. 185, 527 P.2d 64, 69–70 (1974); *Hauenstein v. St. Paul-Mercury Indemnity Co.,* 242 Minn. 354, 65 N.W.2d 122, 124–25 (1954).

Admiral's argument that exclusions (g)(2) and (3) preclude recovery must be rejected.

5. The rationale underlying the distinction between normal business risks and catastrophic risks has been stated as follows:

The consequence of not performing well is part of every business venture; the replacement or repair of faulty goods and works is a business expense, to be borne by the insured-contractor in order to satisfy customers....

There exists another form of risk in the insured-contractor's line of work, that is, injury to people and damage to property caused by faulty workmanship. Unlike business risks of the sort described above, where the tradesman commonly absorbs the cost attendant upon the repair of his faulty work, the accidental injury to property or persons substantially caused by his unworkmanlike performance exposes the contractor to almost limitless liabilities. While it may be true that the same neglectful craftsmanship can be the cause of both a business expense of repair and a loss represented by damage to persons and property, the two consequences are vastly different in relation to sharing the cost of such risks as a matter of insurance underwriting.

*Weedo v. Stone-E-Brick, Inc., supra,* 405 A.2d at 791 (N.J.1979) (citations omitted); *see also Tinker, supra,* at 223–26.

*Exclusion (k).* Exclusion (k) excludes coverage of

personal injury, property damage or advertising injury arising out of the conduct of any partnership, or joint venture of which the Insured is a partner or member and which is not designated in this policy as a Named Insured[.]

Admiral argues that Scott and Honeycomb in building the dryer were engaged in a "joint venture" and that the 1977 failure of the dryer is therefore excluded from coverage. This contention may be quickly rejected.

█ A joint venture is a business association by which two or more entities or persons pool their property, money, efforts, skill, or knowledge to jointly seek profits. *Simpson v. Richmond Worsted Spinning Co.,* 128 Me. 22, 29–32, 145 A. 250 (1929); Black's Law Dictionary 73, 973 (Rev. 4th ed. 1968); *See Waldo Lumber Co. v. Metcalf,* 132 Me. 374, 377–78, 171 A. 395 (1934); *Trumpfeller v. Crandall,* 130 Me. 279, 287, 155 A. 646 (1931). It is similar to a partnership, differing primarily in that the joint venture is generally limited in scope and duration. *Simpson, supra,* 128 Me. at 29–32, 145 A. 250; Black's Law Dictionary, *supra,* at 73. Necessarily implicit in the notion that joint venturers *jointly* seek profits is the notion that they seek profit from some third party. Here only Scott was directly concerned with sales to a third party; Scott alone bore the risk and anticipated the reward of its toilet paper venture. Clearly, Honeycomb is more properly viewed as a contractor hired by Scott than as a joint venturer.[6]

## D. *Attorney's Fees*

█ Honeycomb argues that it is entitled to recover the attorney's fees incurred

in prosecuting this action, citing *Union Mutual Fire Insurance Co. v. Inhabitants of the Town of Topsham,* 441 A.2d 1012 (Me. 1982). A close examination of *Union Mutual,* however, indicates that it does not support an award of attorney's fees here.

*Union Mutual* involved an action brought by an insurer seeking a declaratory judgment that it had no duty to defend the insured in an action for wrongful death. The Maine court held that insurers have a duty to defend their insureds so long as there exists a *possibility* that a liability claim falls within the insurance coverage. *Id.* at 1015. The court went on to state:

Because the liability insurer's duty of defense is so extensive and the burden on the insured of a breach of that duty is likely to be so heavy, we conclude that the insurer should not enjoy the usual freedom to litigate without concern about the possibility of having to pay the other party's attorneys' fees. When the duty to defend is clear from the policy and the pleadings, so that the insurer's commencement of the declaratory judgment action must be attributed to a refusal *in bad faith* to honor its obligation under the policy, the insured should be entitled to his reasonable attorneys' fees in defending the declaratory judgment action as an element of damages for the insurer's breach of its contract obligation.

*Id.* at 1019 (emphasis supplied). The court, however, refused to award the attorney's fees incurred in defending the declaratory judgment action before it, finding that the duty to defend in the case before it was far from obvious. *Id.*

It is unclear whether *Union Mutual*'s "bad faith" exception to the general rule that parties pay for their own attorneys would have any application here. The court

---

**6.** It is true that Scott and Honeycomb worked closely together. But that does not change the fact that they worked closely together in anticipation of a sale from Honeycomb to Scott, not in anticipation of a sale from Honeycomb and Scott to some third party. Moreover, it should be noted that Scott and Honeycomb worked

closely together on the feasibility study, not on the fabrication of the dryer. They therefore could at most be viewed as joint venturers in the feasibility study. The injuries, however, arose out of errors in fabrication, not out of errors in the performance of the feasibility study.

**1410**

in *Union Mutual* expressly limited its holding to the situation where the declaratory judgment action has been brought by the insurer. *Id.* at 1019 n. 8. Here the action has been brought by the insured. Furthermore, *Union Mutual* involved a duty to defend, "a duty broader than the duty to pay or indemnify." *American Policyholders' Insurance Co. v. Cumberland Cold Storage Co.*, 373 A.2d 247, 250 (Me.1977) (citations omitted). But even if a "bad faith" exception to the general rule exists in the present context, Honeycomb is nevertheless not entitled to attorney's fees. It has offered no evidence that Admiral has declined coverage in bad faith; Admiral's obligation under its policy to indemnify Honeycomb was far from obvious.

Honeycomb's request for attorney's fees is therefore denied.

### III.

### ORDER

Since the record before the Court shows that there is no genuine issue as to any material fact and that Honeycomb is entitled to a judgment as a matter of law, *see* Fed.R.Civ.P. 56(c), Admiral's motion for summary judgment is denied; Honeycomb's motion for summary judgment is granted; and judgment will be entered for Honeycomb against Admiral in the stipulated amount of $250,000, plus interest from September 18, 1981 to the date of judgment at the rate of 8% per year, without compounding. Honeycomb's request for attorney's fees is denied.

IT IS SO ORDERED.