ALIBERTI, LaROCHELLE & HODSON ENGINEERING CORP., INC., and AL & H Construction Management, Inc., Plaintiffs

v.

FEDERAL DEPOSIT INSURANCE CORP., Counterclaimant and Third–Party Plaintiff

v.

ALIBERTI, LaROCHELLE & HODSON ENGINEERING CORP., INC., AL & H Construction Management, Inc., Donald LaRochelle, Third–Party and Counterclaim Defendants.

Civ. No. 92–157–P–C.

United States District Court, D. Maine.

Feb. 23, 1994.

John B. Cole, Auburn, ME, for plaintiffs.

Elizabeth G. Knox, Thompson & Bowie, Portland, ME, for Donald LaRochelle.

Len Gulino, Preti, Flaherty, Beliveau & Pachios, Portland, ME, for FDIC.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, Chief Judge.

This civil action arises out of a failed real estate construction project. The original Plaintiffs, and now Counterclaim Defendants, Aliberti, LaRochelle & Hodson Engineering, Inc. and Aliberti, LaRochelle & Hodson Construction Management, Inc. filed this action on the theories of mechanics lien, breach of contract, and *quantum meruit*. The Federal Deposit Insurance Corporation ("FDIC")[1] counterclaimed for negligent misrepresentation and negligence against Engineering and Construction Management. The FDIC also

---

1. This case was originally filed by Plaintiffs in state court against Defendant New Heritage Bank. On March 6, 1992, the Commissioner of Banks of the Commonwealth of Massachusetts took possession of New Heritage Bank, and appointed the FDIC as liquidating agent/receiver of New Heritage Bank. *See* 12 U.S.C. § 1821(e). On April 30, 1992, the case was removed to this Court and the FDIC was substituted as a Defendant and Third–Party Plaintiff. *See* 12 U.S.C. § 1819(b).

complained against Third–Party Defendant Donald LaRochelle on the same theories. The original claims filed by Plaintiffs Aliberti, LaRochelle & Hodson Engineering, Inc. and Aliberti, LaRochelle & Hodson Construction Management, Inc. have been dismissed with prejudice. *See* Docket No. 73. Thus, the only issues remaining involve the counterclaims and third-party claims.

The case was tried without a jury. Based on the testimony at trial and the exhibits submitted in evidence, the Court makes the following findings of fact and conclusions of law.

## I. FACTS

In the spring of 1988, First Meridian Group ("the Developer") was making plans to build a 180 unit condominium/motel project in Old Orchard Beach, Maine. The Developer contracted with two entities for the construction of the Rainbow/Seabreeze project: Aliberti, LaRochelle & Hodson Engineering ("Engineering"), and Aliberti, LaRochelle & Hodson Construction Management ("Construction Management").[2] Paul Beaudette was the principal representative of Construction Management. Beaudette was vice president of Construction Management and the project manager on this project. Tr. Vol. I at 329, 429. Ernest A. Ray also represented Construction Management.[3] Donald LaRochelle represented Engineering on this project.[4] Tr.Vol. II at 5. John Aliberti, president of Engineering, was also involved in the project on behalf of Engineering.

Edward McCormick, senior vice president of New Heritage Bank ("the Bank"), was first approached by the Developers about financing the Rainbow/Seabreeze project in August or September of 1988. Tr.Vol. I at 18. The first meeting between the Bank and the Developer, represented by Thomas Laudani and Chris LeSaffre, took place sometime in September 1988. Tr.Vol. I at 20. The project the Developers first described to the Bank required financing in the neighborhood of $10 million. Tr.Vol. I at 20. McCormick told the Developers that the project cost far exceeded the lending limits of the Bank. Tr.Vol. I at 20.

In subsequent meetings, the Developers proposed the possibility of streamlining the project temporarily to accommodate the Bank's lending limits. Tr.Vol. I at 22, 25. By late October, the Developers presented the Bank with a revised plan to downsize the project to 45 condominium/motel units at a cost of approximately $900,000. Tr.Vol. I at 22–23. The idea was not to eliminate permanently the other part of the project, but to undertake the construction in phases in order to permit financing within the lending limits of the Bank. Tr.Vol. I at 22.

In early November, the Developer presented the Bank with a reduced budget of $918,000 which was to cover the cost of construction for the first 45 units of the project, or "Phase I." Tr.Vol. I at 23, 28. The Bank's financing was to purchase the property and complete construction of three buildings each consisting of fifteen condominium/motel units. Tr.Vol. I at 28; Ex. 44. The Developer wanted to have Phase I of the project operating and economically self-sustaining by the summer so that unit rentals

---

**2.** Engineering contracted to work with the Developer on August 16, 1988. Ex. 6. Shortly thereafter, Engineering marketed the services of Construction Management to the Developer, with the Developer and Construction Management entering into a separate contract on October 14, 1988. Ex. 2, 22.

**3.** Ray was the president and a member of the board of directors for Construction Management. Ray served on the board of directors of AL & H Engineering as well as AL & H Professional Associates, Inc., the holding company which owned Engineering and Construction Management. Tr.Vol. I at 284–85. In addition, Ray owned stock in the holding company. Tr.Vol. I at 285.

Ray testified that he attended approximately four meetings for this project in the fall of 1988, but was not intimately involved in the details of construction. Tr.Vol. I at 287, 322. Ray was involved in some of the cost estimating, but not on a consistent basis. However, he became fully involved in the day-to-day operations of the project in February 1989. Tr.Vol. I at 306.

**4.** LaRochelle was chair of the board of Aliberti, LaRochelle & Hodson Professional Associates, Construction Management, Engineering, AL & H Engineers and Surveyors, and AL & H Spagnatti Architects. Tr.Vol. II at 2–3. LaRochelle also served as president of AL & H Professional Associates. Tr.Vol. II at 3.

could generate sufficient income to cover the debt service on the loan. Tr.Vol. I at 23, 26.

The Bank was interested in financing this phase of the project and it began the process of what McCormick described as due diligence—where the bank investigates the economics of the project and calculates the loan-to-value ratio in order to determine the feasibility of the project. Tr.Vol. I at 34. As part of this investigation, the Bank looked at the personal financial statements of the individual Developers and assessed the projections for the average rental income which could be generated from the completion of Phase I, in the event that subsequent financing was delayed. Tr.Vol. I at 34–35. The Bank also reviewed the contracts between the Developer and Construction Management and Engineering. Tr.Vol. I at 153–54, 157.

Next, the Bank hired Ron Russo, an experienced lender's inspector, in order to verify the construction information. Tr.Vol. I at 46, 52, 236, 404. The Bank relied a great deal on Russo for the technical aspects of the construction project. Tr.Vol. I at 129. After looking at the Means Estimating Handbook, a construction industry reference book, Russo concluded that motels across the country could be built in the price range proposed by the Developer. Ex. 166; Tr.Vol. I at 238, 240. This conclusion was reinforced by research of construction costs for projects that Russo had been involved in previously. Tr. Vol. I at 240.

The Bank and Russo planned to meet with the Developer and the construction professionals. Tr.Vol. I at 53. The Bank needed Russo at the meeting because of his construction expertise to talk to the construction professionals as well as to review the budget and costs. Tr.Vol. I at 57–58, 242. The Developer informed Construction Management and Engineering about the meeting. Tr.Vol. I at 460. Beaudette told the Developer that Construction Management would be prepared to answer any questions the Bank had about the project. Tr.Vol. I at 445.

In the meantime, the Bank's loan committee issued a commitment letter to the Developers with a number of conditions attached to it. Ex. 44. Although the loan committee voted to approve the loan, final approval was based on compliance with the contingencies outlined in the commitment letter. Tr.Vol. I at 137. Appended to the commitment letter was a budget provided by the Developer with line item costs and the total project budget of $918,000 (therein and hereinafter "schedule B budget"). Ex. 44 schedule B. The commitment letter, dated December 14, 1988, was picked up by the Developer from the Bank. Engineering and Construction Management also received a copy of the commitment letter from the Bank. Tr.Vol. I at 55, 456; Tr.Vol. II at 21. After reviewing the schedule B budget, Construction Management notified *the Developer* that the budget contained insufficient money for each line item, and that there were line items missing such as the elevator, Construction Management fees, general costs, and winter conditions. The Developers told Construction Management that this was just an interim budget and not to worry about the missing budget items. Tr.Vol. I at 95, 461; Exs. 137, 141.

The meeting requested by the Bank was scheduled for the afternoon of December 20, 1988, at the offices of the Developer in Saco, Maine. Tr.Vol. I at 56. Earlier that day a project meeting was held between Beaudette, LaRochelle, and the Developers. Tr.Vol. I at 466–67. Financing was discussed at this meeting, Tr.Vol. I at 467, and the issue of the insufficiency of the budget came up again.[5] Tr.Vol. I at 462. The Developer again explained they were "not to worry about it"; that this was an interim budget, and that the full financing package would encompass all the costs. Tr.Vol. I at 461.

When McCormick and Russo arrived, the Developer and the construction people were still in the project meeting. Tr. Vol. I at 57. Shortly thereafter, the meeting with the

---

5. Beaudette testified that he was under the impression during the December 20 meeting that the Bank was providing only interim financing which would later be taken out by a global financing package to complete all 180 units. Tr. Vol. I at 527. This conclusion is contrary to the explicit language of the loan commitment letter, which Beaudette had reviewed, specifying that the loan was to construct 45 motel units. Tr.Vol. I at 527.

Bank got under way. Present at the afternoon meeting were McCormick, Russo, LaRochelle, Beaudette, and representatives of the Developer. Tr. Vol. I at 58, 225–26. The Developer led off the meeting, stating that the purpose of the meeting was to make sure that everything in the commitment letter was covered to the Bank's satisfaction. Tr. Vol. I at 226–27, 373. The Developer then gave an overview of what the project entailed. Tr. Vol. I at 404, 471. McCormick told everyone, at the outset, that he had to verify the cost estimates and the time frame of the project.[6] Tr. Vol. I at 228–29, 373. He then described the Bank's understanding of the project—the downsized phase of the project, the cost of the project, the permits necessary for construction, and certain site work and underground work. Tr. Vol. I at 59–60. Russo explained his role in the project as monitoring the progress of construction for the Bank. Tr. Vol. I at 62, 83.

During the meeting, information came out that dramatically changed McCormick's understanding of how the project was to be managed. Tr. Vol. I at 63. The Developers explained that they could not comply with the commitment letter's requirement for a bonded general contractor, because of the nature of the construction process. Tr. Vol. I at 63, 65, 75, 229, 471–72. They explained that this was a fast track project, using a construction manager. Tr. Vol. I at 66; Tr. Vol. II at 17. McCormick's prior experience was with construction contracts involving a fixed price and bonding. Tr. Vol. I at 24. The Developer explained that under construction management, it is not necessary to have a complete set of detailed drawings before construction starts, unlike projects managed by a general contractor who needs a full set of drawings in order to put the job out to bid. Tr. Vol. I at 250.

Overall, the construction management process was presented to the Bank as an advantageous way to run the project because of its flexibility in terms of both time and cost. Tr.

Vol. I at 64–66, 230, 483. Construction Management and Engineering presented themselves as a team capable of controlling the project costs. Tr. Vol. I at 64, 252. The advantages of this system were represented to be that the construction professionals could do the designs on schedule so that materials could be ordered in a timely manner. Tr. Vol. I at 249. Construction Management's responsibilities were to put information out to bid and to manage the ongoing work. Tr. Vol. I at 252. If Construction Management had a hard time getting bids within an acceptable range, then they would ask Engineering to redesign that part of the project. Tr. Vol. I at 252. Engineering's responsibilities included controlling costs by redesigning part of the project to compensate in one area for overruns in other areas of the budget. Tr. Vol. I at 250–52.

Everyone at the meeting had a copy of the schedule B budget. Tr. Vol. I at 62, 253. The budget consisted of twenty-four items denoting the "hard costs" of construction. Tr. Vol. I at 29. Ex. 44, schedule B. Hard costs included those items of construction directly related to acquiring materials and equipment and installing them on site. Tr. Vol. II at 60. In other words, hard costs were the actual costs of completing the structures. Construction Management fees and costs associated with extra work due to winter conditions fell into the definition of "soft costs." Tr. Vol. I at 29, 477–78. The Developer announced that the soft costs would be taken care of by their organization and that, therefore, those costs were not included in the budget.[7] Tr. Vol. I at 31, 69–70, 255, 372, 478. Russo reviewed the schedule B budget line items as well as the total project cost estimate and received assurances that the numbers were accurate. Tr. Vol. I at 79–80, 230–32, 253–56, 408–409.

Russo also discussed the requisition process with the construction professionals. Tr. Vol. I at 473. After Construction Manage-

6. McCormick's testimony was only contradicted by LaRochelle, who testified that he did not recall any discussion of the actual cost of the project at the meeting, but that $918,000 was discussed as interim financing. Tr.Vol. II at 24–25.

7. Testimony supports the conclusion that it is not unusual in the industry for the Developer to shoulder the soft costs and that the Bank pay only the hard costs of construction. Tr.Vol. I at 212.

ment and Engineering submitted a requisition, Russo would provide commentary on that requisition and the Bank would pay as advised. Tr. Vol. I at 85, 268. Russo requested that Construction Management and Engineering use the American Institute of Architects (hereinafter "AIA") forms for the requisitions. Tr. Vol. I at 261–62, 473. Beaudette told Russo that he would use a computer-generated requisition form similar to the AIA form. Tr. Vol. I at 474. At the meeting, Construction Management and Engineering were told that *if the project costs changed, then the change in cost should be noted on the requisition form.* Tr. Vol. I at 264–65.

Before the meeting concluded, Russo and McCormick discussed the project out of earshot of the other participants. Russo told McCormick that in his opinion, "there [was] some risk," Tr. Vol. I at 259, and that costs could go as high as $1.1 million for a job of this type. Tr. Vol. I at 259–260, 406. Therefore, McCormick knew that the $918,000 was not a guaranteed figure. Tr. Vol. I at 108. However, Russo and McCormick received assurances from the Developer, Beaudette, and LaRochelle on the accuracy and feasibility of the budget. Tr. Vol. I at 67–69, 77. McCormick thought there might be concern about who was required to pay the soft costs. As a result, McCormick reiterated that the $918,000 budget did not include any monies for soft costs. Tr. Vol. I at 69.

After the December 20 meeting, McCormick reported back to the loan committee and discussed changes in the loan—the fact that it would not be bonded and that bidding on individual construction items had not been completed. Tr. Vol. I at 107–108. The Bank waived the condition of a bonded general contractor as well as other conditions of the commitment letter that could not be complied with because of the construction management nature of the project. Tr. Vol. I at 78, 120.

The loan closed on January 6, 1989. Tr. Vol. I at 81, 83. The promissory note mani-fested a commitment to lend up to $1,700,000 to the Developer. Ex. 63; Tr. Vol. I at 130. After the loan was closed, the Bank began making advances pursuant to the requisitions. The requisitions were signed by representatives of both Construction Management and Engineering, including LaRochelle. Tr. Vol. I at 83–86, 264; Ex. 84. The signatures on the requisitions attested to the accuracy of the document, Tr. Vol. I at 265, and that the signatories still had confidence in the $918,000 total project budget. Tr. Vol. II at 73–74, 77. When a requisition was received, Russo would inspect the site to determine if the requisition represented completed work authorized by the budget. If it did, Russo would recommend in his inspection report that the Bank pay the amount requested. Tr. Vol. I at 83–84.

After the first month, Russo became concerned that the project was in trouble, but the requisitions continued to display the $918,000 number attested to by the signatures of representatives of Construction Management and Engineering. Tr. Vol. I at 84, 271–72. Shortly thereafter, Russo recommended that the Bank make no further payments. After visiting the site on March 3, 1989, Russo wrote a project inspection report to the Bank, stating that "[a]lthough req[uisition] # 4 does represent work completed, I can not [sic] approve any further req[uisition]s until AL & H has completed the bid process and construction cost for project become fixed." Ex. 113. Within a week, a meeting took place at which Construction Management presented Russo with a revised budget that it had developed with a total project cost of approximately $1,700,-000. Ex. 115; Tr. Vol. I at 276, 492. Many of the line items from this budget had not appeared on the schedule B budget. Tr. Vol. I at 283; Ex. 115. After a series of unsuccessful meetings between representatives of the Bank, the Developer, Construction Management, and Engineering, work on the project was suspended.[8] Ex. 117, 123; Tr. Vol.

---

8. During this time, Russo discussed the problems with the Developer. The Developer blamed Construction Management for the increased costs. Tr.Vol. I at 86–87. Construction Management, on the other hand, insisted that the increased cost resulted from additional items and changes to the project requested by the Developer. The items Construction Management argued were added to the original plans include: an elevator, mansard roof design, decks, and fire alarms.

I at 402–403. Sometime in March, the Bank and the Developer agreed to stop the project. Ex. 132; Tr. Vol. I at 89, 98.

The Developers were unable to get the project underway thereafter and had drawn $1,251,762.38 from the $1,700,000 in available loan money. Tr. Vol. I at 105; Ex. 77. The property was advertised for sale and sold at a foreclosure auction on January 25, 1990. Tr. Vol. I at 178–79, 223. The Bank purchased the property on its bid of $951,000. Tr. Vol. I at 99–102.

## II. ANALYSIS

### A. NEGLIGENT MISREPRESENTATION

■ The Court understands the FDIC's claim of negligent misrepresentation to be based in four general categories: (1) statements that the project could be completed for approximately $918,000; (2) failure to disclose knowledge of missing line items on schedule B; (3) failure to disclose knowledge that some of the line items from schedule B were insufficient based on previous cost estimates; and (4) false statements of the total project cost on the requisitions.[9]

### 1. The Legal Standard Under Maine Law

In *Chapman v. Rideout*, 568 A.2d 829 (Me. 1990), the Law Court adopted section 552 of the Restatement (Second) of Torts. Section 552 provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (1977).

First, it is clear that both Construction Management and Engineering had a pecuniary interest in having the Bank extend the construction loan to the Developer. Testimony at trial established that Construction Management became concerned about the financing after the Casco Bank financing fell through in October 1988.[10] Tr. Vol. I at 446. Construction Management agreed to continue to work on the project in hopes that the Developer would obtain financing. Tr. Vol. I at 446. In early December, the Developer told Construction Management and Engineering that the scope of the project was to be reduced to three buildings. Tr. Vol. I at 447. By this time, Construction Management and Engineering were concerned that their fees were not going to be paid. Tr. Vol. I at 447, 453–54. By early December 1988, Construction Management and Engineering were owed approximately $76,000. Tr. Vol. I at 454. Engineering and Construction Management threatened to resign from the project because of the Developer's delinquent payments. Tr. Vol. I at 76, 314; Ex. 40 (letter from Aliberti to the Developers dated December 6, 1988, states that both AL & H entities are suspending work until they are paid the $76,000 owed by the Developer). Without the financing from the Bank, Engineering and Construction Management risked nonpayment of their overdue fees.

### 2. Misrepresentations at the December 20 Meeting

The FDIC contends that at the December 20 meeting, representatives of both Engineering and Construction Management made

---

Ex. 125. The evidence established that Construction Management and Engineering knew of the existence of these items, but chose not to alert the Bank of the inaccuracy of the budget. *See* Ex. 171, drawing F–11 (elevator shaft foundation drawing complete January 1, 1989); Ex. 171, drawings, A–3, A–4, A–5, A–6, A–7, A–11, A–12, A–13, A–14, A–18, A–19, A–20, A–21, A–22 (architectural drawings depicting mansard roof design complete January 23, 1989); Ex. 172, drawing E–6 (fire alarm system diagram complete October 31, 1988).

9. The FDIC also suggests that Construction Management and Engineering gave the Bank assurances regarding the date of completion of Phase I of the project. There is insufficient evidence in the record from which to conclude that there were any assurances given regarding the date of completion of this project.

10. In October 1988, Construction Management was owed approximately $17,000 by the Developer. Tr.Vol. I at 446–47.

statements regarding the viability of the total project which they knew to be false. Moreover, they failed to disclose that they knew some hard costs of construction were missing from the budget and that the budget presented to the Bank was inadequate based on their own estimates. Defendants counter that they gave the Bank only "opinions" about cost estimates which are not actionable under the law of negligent misrepresentation.

The evidence at trial established that the schedule B budget originated with the Developers. Nevertheless, on December 14, after receiving a copy of the Bank's commitment letter, both Engineering and Construction Management recognized that line items were missing and that a number of line items were insufficient as stated. Tr. Vol. I at 456–58. Beaudette testified that after he discovered the errors in the schedule B budget, he showed it to Ray and Aliberti. They agreed with Beaudette's assessment that there were line items missing and that the value engineering figures that they had produced were not contained in schedule B. Tr. Vol. I at 458–59. Although Beaudette testified that, at the time, he did not know the budget contained insufficient money for each line item [11], Tr. Vol. I at 459, Construction Management admitted that it alerted the Developer before the December 20 meeting that the budget contained insufficient money for each line item, and that there were line items missing. Ex. 176, ques. 173, 174. Moreover, at trial Beaudette reviewed a letter prepared by Aliberti on or about May 12, 1989, which included his handwritten changes. Beaudette testified that the letter accurately stated that Engineering and Construction Management had alerted the Developers when they received the commitment letter that there was insufficient money for each line item and that there were line items missing altogether.[12] Tr. Vol. I at 504–506; Ex. 141. Therefore, the evidence clearly established that both Engineering and Construction Management knew some hard costs of construction were missing from the budget and that the budget presented to the Bank was inadequate based on their own estimates.

This conclusion is reinforced by evidence that on December 20, just prior to the meeting with the Bank, Beaudette, in LaRochelle's presence, again brought up the insufficiency of the budget. Tr. Vol. I at 462–63, 502. Construction Management and Engineering were fully aware of the insufficiency of the budget well in advance of the December 20 meeting. Both Construction Management and Engineering were involved in estimating costs of various aspects of the project before the December 20 meeting.[13] Tr. Vol. I at 22–23, 323. This conclusion is consistent with their duties under their contracts with

11. Beaudette later contradicted his own testimony, stating that after receiving the commitment letter, he contacted the Developer to ask why some of the line items were missing. Tr.Vol. I at 461. During that telephone conversation with the Developer, Beaudette told the Developer that the site work figure that is in schedule B budget is one-half of what the entire site work cost. Tr.Vol. I at 461. The Developer told him "not to worry about it," that this was an interim budget, and that the full financing package would encompass all the construction costs. Tr.Vol. I at 461.

12. The letter designated as exhibit 141 was drafted by Aliberti, but it was never sent to the Bank. Tr.Vol. II at 28–29. The letter states that "[w]hen we first received your letter of commitment in December 1988 we alerted the owners that not only was there insufficient money for each line item, there were line items missing such as elevator, construction management, general conditions, etc." Ex. 141.

13. The record is replete with examples of Engineering and Construction Management having performed cost estimates for the project. See Ex. 7 (Engineering's notes from August 16, 1988, project meeting); Ex. 8 (Engineering's notes from August 19, 1988, project meeting state "AL & H will have numbers (costs) for dryvit vs. clapboard"); Ex. 10 (Engineering's notes from August 30, 1988, project meeting); Ex. 11 (Engineering's notes from September 8, 1988, project meeting); Ex. 13 (Beaudette's notes reflecting the bids received for the site demolition work); Ex. 18 (Engineering's notes from October 4, 1988, project meeting state "Paul Beaudette to make comparison sheet of window prices"); Ex. 24 (Engineering's notes from October 18, 1988, project meeting); Ex. 28 (Engineering's notes from November 1, 1988, project meeting state "Paul Beaudette presented the following estimates: Steel $200,000; Rough Carpentry $315,000"); Ex. 33 (Engineering's notes from November 15, 1988, project meeting state "Concrete: Paul found contractor, PPR, who could start 11/21. Price for labor $40,000 Owner would provide concrete and reinforcing. Total price $75,000 to $85,000"); Ex. 52 (Construction Management notes from December 20, 1988, project meeting).

the Developer.[14] Ex. 6, 22; Tr. Vol. I at 291, 299–301; Tr. Vol. II at 148. Moreover, one of the Developers testified that Construction Management was involved in establishing specific line items on schedule B. Ex. 187; Tr. Vol. III at 55–56. Engineering provided estimates for at least the steel components of the project. Tr. Vol. III 127.

The fact that there were items missing from the budget was later borne out by the comparison of the schedule B budget with the revised construction budget projecting the cost to be approximately $1,700,000 (hereinafter "March 10 budget"). The line items in the March 10 budget are broken down into finer detail than the line items in schedule B. Ex. 159. In other words, most line items in the March 10 budget are subsumed within the more generalized categories of the schedule B budget.[15] Tr. Vol. I at

14. The contract between the Developer and Engineering provides for cost estimating to take place in the predesign and design phases of the project. In the predesign phase, the contract requires Engineering to:

> Prepare a statement of the ENGINEER's Opinion of the Construction Cost based upon the preliminary designs developed under this Phase.

Ex. 6 ¶ 1.1.2.4. In the design phase, Engineering is required to:

> Prepare a statement of the ENGINEER's Opinion of the Construction cost for the Prject [sic] based upon designs established to this point.

Ex. 6 ¶ 1.1.3.3. The agreement further provides:

> Any Opinion of Construction Cost prepared by the ENGINEER represents his judgment as a design professional and is supplied for the general guidance of the OWNER. Since the ENGINEER has no control over the cost of labor and material, or over competitive bidding or market conditions, the ENGINEER does not guarantee the accuracy of such Opinions as compared to Contractor bids or actual cost to the OWNER.

Ex. 6 ¶ 5.8.5.

The agreement between the Developer and Construction Management is a standard AIA contract requiring cost estimating. Tr.Vol. I at 291. In the preconstruction phase the contract requires Construction Management to:

> Provide preliminary evaluation of the program and Project budget requirements, each in terms of the other. With the Architect's assistance, prepare preliminary estimates of Construction Cost for early schematic designs based on area, volume and other standards. Assist the Owner and the Architect in achieving mutually agreed program and Project budget requirements and other design parameters. Provide cost evaluations of alternative materials and systems.
> Review designs during their development. Advise on site use and improvements, selection of materials, building systems and equipment and methods of Project delivery. Provide recommendations on relative feasibility of construction methods, availability of materials and labor, time requirements for procurement, installation and construction, and factors related to cost including, but not limited to, costs of alternative designs or materials, preliminary budgets and possible economics.

Ex. 22 ¶¶ 1.1.1 and 1.1.2. In the construction phase, the contract requires Construction Management to:

> Revise and refine the approved estimate of Construction Cost, incorporate approved changes as they occur, and develop cash flow reports and forecasts as needed.
> Provide regular monitoring of the approved estimate of Construction Cost, showing actual costs for activities in progress and estimates for uncompleted tasks. Identify variances between actual and budgeted or estimated costs, and advise the Owner and the Architect whenever projected costs exceed budgets or estimates.

Ex. 22 ¶¶ 1.2.3 and 1.2.3.1. The contract further provides that:

> Evaluations of the Owner's Project budget and cost estimates prepared by the Construction Manager represent the Construction Manager's best judgment as a professional familiar with the construction industry. It is recognized, however, that neither the Construction Manager nor the Owner has control over the cost of labor, materials or equipment, over Contractors' methods of determining Bid prices or other competitive bidding or negotiating conditions. Accordingly, the Construction Manager cannot and does not warrant or represent that Bids or negotiated prices will not vary from the Project budget proposed, established or approved by the Owner, or from any cost estimate or evaluation prepared by the Construction Manager.

Ex. 22 ¶ 3.3. Terrien testified that in the contracts, opinions about construction costs are not guaranteed; they are just the professional's best judgment. Ex. 6 ¶ 5.8.5; Tr.Vol. II at 84. In this case, the increased cost did not result from increased labor or materials cost. Rather, the increased cost estimates existed from the outset.

15. Comparison of construction cost estimates:

| LINE ITEM | SCHEDULE B BUDGET | MARCH 10 BUDGET |
|---|---|---|
| **Schedule B budget** | | |
| March 10 budget | | |
| **Sitework** | **$107,500** | |
| Sitework | | $125,500 |
| Site Winter Conditions | | 19,000 |

420; Tr. Vol. II at 60–61. Testimony at trial established that it was reasonable for Russo to assume that some of the numbers broken down into two or three categories in the later budget were encompassed in one figure on schedule B. Tr. Vol. I at 494–96; Tr. Vol. II at 60–61. The Court concludes, then, that it was reasonable for the Bank to assume that the additional items in the March 10 budget were included in the schedule B budget.

At the December 20 meeting with the Bank, Russo carefully reviewed the accuracy of the line items on the budget with LaRochelle and Beaudette. Although Russo was aware that soft costs were missing from the budget, Tr.Vol. I at 254, no one said that cost estimates for some of the line items were inaccurate, Tr.Vol. I at 256, 502, or that some

| | | |
|---|---:|---:|
| **Steel** | **150,000** | |
| Steel | | 187,577 |
| Stairs and Rails | | 30,000 |
| **Concrete** | **37,500** | |
| Concrete | | 32,976 |
| Concrete Flatwork | | 5,000 |
| Masonry | | 8,500 |
| **Sewer Connect** | **55,800** | |
| Sewer Connect | | 55,800 |
| **Framing** | **137,500** | |
| Framing Labor | | 95,000 |
| Materials/Doors | | 140,000 |
| Siding Labor | | 25,000 |
| **Windows** | **44,000** | |
| Windows | | 65,700 |
| **Plumbing** | **27,500** | |
| **Finish Plumbing** | **16,000** | |
| Plumbing u/g | | 16,426 |
| Plumbing a/g | | 110,000 |
| **HVAC** | **46,500** | |
| **Sprinkler** | **23,250** | |
| Sprinkler | | 30,500 |
| **Electric** | **22,500** | |
| **Finish Electric** | **19,000** | |
| Electric | | 142,000 |
| **Insulation** | **17,500** | |
| Insulation | | 13,000 |
| **Drywall** | **45,000** | |
| **Interior Paint** | **20,000** | |
| Drywall & Interior Paint | | 105,500 |
| Alarm System | | 36,000 |
| **Finish Carpentry** | **18,500** | |
| Finish Carpentry | | 20,000 |
| **Exterior Paint** | **15,000** | |
| Exterior Paint | | 25,000 |
| **Kitchen Cabinets** | **27,500** | |
| Kitchen Cabinets & Millwork | | 94,048 |
| **Appliances** | **15,000** | |
| **Roofing** | **20,000** | |
| Roofing | | 45,000 |
| Mansard Roofing | | 40,000 |
| **Vinyl Flooring** | **2,500** | |
| **Carpet (labor)** | **6,000** | |
| **Carpet (materials)** | **14,000** | |
| Flooring | | 31,848 |
| **Landscaping** | **30,000** | |
| Landscaping | | 60,000 |
| Bath Accessories | | 4,000 |
| Demolition | | 21,880 |
| Elevator | | 12,950 |
| Testing and Inspection | | 3,750 |
| General Conditions | | 104,000 |
| **TOTAL** | **$918,050** | **$1,705,955** |

hard costs of construction were missing from the budget.[16] Tr.Vol. I at 71, 256, 423, 481. After reviewing the individual budget line items, Russo asked if there was anything that would make the numbers change significantly, and the response from the representatives of Construction Management and Engineering was "No." Tr. Vol. I at 258. In addition, Russo asked whether the overall construction budget was sufficient. He was told that it was. Accordingly, the Bank received assurances from Beaudette and LaRochelle that the project could be done for around $918,000. Tr.Vol. I at 79–80, 230–32, 253–54, 408–409. The Bank relied on these assurances in extending the loan to the Developers. Tr.Vol. I at 79–81.

The Court concludes that Engineering and Construction Management were aware of the insufficiency of the line items and that there were line items missing from the budget. In addition, Construction Management and Engineering knew, or should have known, that the project could not be built for $918,000, yet they assured the Bank that the budget was sufficient. This statement was not warranted by the information Defendants had concerning the budget.

George B. Terrien, the Bank's construction expert, testified that this sort of meeting with a lender is common in the construction industry. Tr.Vol. II at 63. The purpose of this type of meeting is for the financing agent to gain sufficient assurances to close the loan and to proceed with the project. Tr.Vol. II at 64. Moreover, Terrien testified that construction professionals are fully aware of the lender's purpose for holding the meeting. Tr.Vol. II at 64. Russo confirmed that he expected the design and construction professionals to tell him if they thought the estimates for the line items were inaccurate or that the budget was unsound. Tr.Vol. I at 256–57. Ray also testified that he thought the construction professionals had an obligation to be honest with the Bank. Tr.Vol. I at 308. Therefore, the Court concludes that the Bank justifiably relied on the representa-

tions of Engineering and Construction Management in making its decision to go ahead with financing this project.

*3. Misrepresentations on the Requisitions*

The first requisition, signed by Beaudette and LaRochelle on behalf of Construction Management and Engineering lists $918,000 as the total project cost. Ex. 84; Tr.Vol. I at 272. Russo's project report regarding this requisition dated January 20, 1989, indicates concern because three of the ten line items are Construction Management fees, specifically excluded from the budget. Ex. 89; Tr.Vol. I at 266–67, 272. On the second requisition, signed by Beaudette and LaRochelle, Ex. 107; Tr.Vol. I at 273, Russo began to notice budget overruns. Ex. 105; Tr.Vol. I at 270, 274. Russo was also concerned about the broad manner in which the requisition entries were phrased. Tr.Vol. I at 268. Russo's project report to the Bank dated February 24, 19[89], expresses serious concerns about the project and projects that it could exceed budget by about $151,000. Ex. 105.

When Russo expressed these concerns to Construction Management and Engineering, he was told that site work was being done for all six buildings. Ex. 105. The site work for the project had a large overrun because the site work for Phase II was also done during Phase I. Tr.Vol. I at 280. The Bank was unaware of, and the requisitions never identified, this as additional work. Tr.Vol. I at 75, 279, 421.

The evidence establishes that it was reasonable for the Bank to rely on the representations made by Construction Management and Engineering by way of the requisitions. Terrien, as well as Russo, testified that the construction professional's signature on a requisition means that a professional has reviewed the amounts claimed by the contractor, related those amounts to the amount of the work done, addressed the arithmetical accuracy of the requisition form, addressed the adequacy of the budget to perform the

16. For example, LaRochelle and Beaudette knew at the meeting that there was to be an elevator in the building and knew this hard cost of construction was missing from the budget. Tr.Vol. II at 25; Tr.Vol. I at 496; Ex. 39 ¶ 19 (Engineering notes from December 5, 1988, project meeting mention an elevator).

construction contracts, and certified that the amount remaining after the requisition is paid will be sufficient to complete the construction contracts.[17] Tr.Vol. I at 272; Tr. Vol. II at 72–73. Ray agreed that Construction Management and Engineering had made representations as to the accuracy of the $918,000 budget when they signed the requisitions. Tr.Vol. I at 345, 354; Ex. 84. Beaudette testified that he understood his signature on the requisition to mean that he "prepared the requisition to the best of his knowledge and that the figures were accurate." Tr.Vol. I at 496–97. Beaudette was aware that the Bank would rely on the requisitions in making the loans. Tr.Vol. I at 497.

The Court concludes that when Engineering and Construction Management signed the requisitions, they were giving the Bank assurances about the continued accuracy of the construction budget when they knew the budget was substantially less than the amount of money needed to complete Phase I of the project. These assurances about the accuracy of the budget led the Bank to wrongfully disburse loan proceeds to the Developer. As noted above, Engineering and Construction Management knew before the loan closed that the $918,000 budget was insufficient.[18] Moreover, Construction Management and Engineering were fully aware that site work for Phase II was ongoing and that the Phase I budget did not identify this extra-budget work. At that time, Defendants were aware that the budget was insufficient to accommodate those additional costs.

Therefore, the Court concludes that even after it became apparent to Construction Management and Engineering that the project could not be completed for the budgeted project cost, they continued to list the $918,000 figure on the requisitions.

Based on the testimony and exhibits admitted in evidence at trial, the Court concludes that Engineering and Construction Management failed to exercise the reasonable care and competence required of construction professionals when they supplied false information for the Bank's guidance. The Bank justifiably relied on this inaccurate information. The misrepresentations induced the Bank into extending the loan to the Developers and to make payments under the requisitions. Finally, the Bank's reliance was a substantial factor in determining the course of conduct that resulted in the loss.

### 4. Defendants' Argument

Defendants assert, without citation to authority, that in order to prevail on a claim of negligent misrepresentation, the FDIC must "prove that Engineering [and Construction Management] failed to exercise reasonable care when [they] issued a *statement of fact* upon which the FDIC relied." AL & H Engineering and Donald LaRochelle's Post–Trial Brief (Docket No. 78) at 12–13. The Restatement does not incorporate that restriction in its definition of negligent misrepresentation. *Restatement (Second) of Torts* § 552. Indeed, the Restatement specifically refers to false "information," drawing omis-

---

17. Charles Heuer, Defendants' construction expert, testified that the requisitions used in this case lacked the language of certification by contractor or engineer. Tr.Vol. II at 150–51. Heuer explained that on a standard AIA requisition form, there are two certification clauses. First, by the contractor certifying that the amount being requested is due according to the terms of the standard AIA contract that the contractor has signed. Tr.Vol. II at 151. Second, the engineer or the architect is certifying that the work has progressed to the point reflected on the form and is in accordance with the quality called for in the contract documents, that the amount of money being asked for as payment is due under the terms of the contract. Tr.Vol. II at 151–52. Although Defendants never put one of the AIA requisitions in evidence for the Court to examine, Heuer apparently wants the Court to conclude that without the certification language the signa-

ture on a requisition is meaningless. The Court rejects this conclusion.

18. Engineering and Construction Management continually failed to inform the Bank that the total project cost was inaccurate. Tr.Vol. I at 510; Ex. 167 (Beaudette's notes: "We're stuck between 1st Meridian and Ron Russo.... [T]he project cannot be built for $918,050 maybe we need to put it in writing."); Tr.Vol. I at 333–37; Ex. 109 (Ray's letter to the Developer dated February 28: "Knowing that our construction cost estimate is more than what was submitted to the bank and the requisitions do not factually represent the true construction cost, puts us (AL & H) in a very awkward position.... [T]here is an immediate need for capital injection and some honest conversations with New Heritage Bank.").

sions as well as misstatements within the scope of its basis for general liability.

Moreover, the Court is not convinced that any of the statements regarding the sufficiency of the budget made by Defendants were opinions. "[I]f one knows an opinion to be erroneous, the matter is as to him, not an opinion but a subsisting fact; and, if he makes a statement contrary to what he knows to be the fact, he should not be allowed to escape the consequences on the theory that his statement concerns a matter of opinion." *Herrick v. State,* 159 Me. 499, 503, 196 A.2d 101 (1963). Construction Management and Engineering were aware that there were items missing from the budget and that the cost of some of the budget items were inaccurate based on their own estimates. Despite this superior knowledge, and the awareness that the Bank would rely on their representations in determining whether to extend the loan, the construction professionals assured the Bank that the budget was sufficient to build Phase I of the project. *See Wildes v. Pens Unlimited Co.,* 389 A.2d 837, 840 (Me.1978); *Shine v. Dodge,* 130 Me. 440, 444, 157 A. 318, 319 (1931) ("[T]he relationship of the parties or the opportunity afforded for investigation and the reliance, which one is thereby justified in placing on the statement of the other, may transform into an averment of fact that which under ordinary circumstances would be merely an expression of opinion.") Therefore, the Court concludes that the statements made by Engineering and Construction Management fall within the *Restatement*'s meaning of "suppl[ying] false information."

## B. NEGLIGENCE

■ A negligent act has been defined by the Maine Law Court as "a violation of the duty to use reasonable care toward another." *Wing v. Morse,* 300 A.2d 491, 495–96 (Me. 1973). To sustain a cause of action in negligence, the plaintiff must prove (1) that the defendant owed plaintiff a duty of care, (2) that the defendant breached that duty, and

(3) that the breach was an actual and legal cause of the injury suffered by the plaintiff. *See e.g., Parker v. Harriman,* 516 A.2d 549, 550 (Me.1986) (citing *Adams v. Buffalo Forge Co.,* 443 A.2d 932, 938 (Me.1982)).

"Fundamentally, whether one party owes a duty of care to another is a question of law." *Trusiani v. Cumberland & York Distributors, Inc.,* 538 A.2d 258, 261 (Me.1988). While the use of a negligence theory to hold construction professionals liable to third parties not in privity is relatively commonplace, *see, e.g., Montijo v. Swift,* 219 Cal.App.2d 351, 33 Cal.Rptr. 133 (1963) (architect who plans and supervises construction has a duty to any person who foreseeably and with reasonable certainty may be injured); *Rhodes–Haverty Partnership v. Robert & Co. Associates,* 163 Ga.App. 310, 293 S.E.2d 876, 878 (1982), *aff'd,* 250 Ga. 680, 300 S.E.2d 503 (1983); *Bodin v. Gill,* 216 Ga. 467, 117 S.E.2d 325 (1960) (architect's design of a church caused water damage to the property of neighboring landowner); *Stephens v. Stearns,* 106 Idaho 249, 678 P.2d 41 (1984) (tenant sued architect for injuries sustained when she fell down a stairwell without handrail); *Totten v. Gruzen,* 52 N.J. 202, 245 A.2d 1 (1968) (child plaintiff burned attempting to climb hot piping system which resembled a ladder); *Coffey v. Dormitory Authority,* 26 A.D.2d 1, 270 N.Y.S.2d 255 (3d Dep't 1966) (student injured by glass panel adjacent to door in dormitory), the Court has found few cases dealing with the duty of construction professionals to lenders.[19] However, a few courts have imposed a duty of care on engineers in their dealings with real estate lenders. For example, in *U.S. Financial v. Sullivan,* 37 Cal.App.3d 5, 112 Cal.Rptr. 18 (1974), the plaintiff had loaned money to a developer to construct homes in a subdivision. The defendant engineer conducted soil tests on the subdivision land. After the houses were finished, differential settlement caused their foundations to fail as well as other damages. Plaintiff brought suit on the theory that the negligence of the soil engineer had impaired the value of the trust

---

**19.** The case law indicates that courts have treated architects and engineers as belonging to the category of construction professionals. *See generally* J. Acret, *Architects & Engineers* (2d ed. 1984 & Supp.1992). Therefore, the Court relies on cases involving architects as well as engineers.

deeds which stood as security for the loans. Since a negligent engineer can be liable to a purchaser of real property, the court found reason to extend such liability to a mortgagee when the negligence impairs the security interest.

In *Browning v. Maurice B. Levien & Co.*, 44 N.C.App. 701, 262 S.E.2d 355 (1980), an architect undertook to supervise construction of an apartment complex for the bank which loaned plaintiff money to finance the cost of the building. The architect inspected the construction at the time of each progress payment request and certified compliance with the plans and specifications. Plaintiff owner sued the architect for overcertification of the payments. The court stated that a construction professional "who contracts to perform services is liable for damages proximately caused by his negligence to anyone who might be reasonably foreseen as relying on [that professional] performing his services in a reasonable manner." *Id.* at 704–705, 262 S.E.2d 355. The *Browning* court concluded that plaintiff was such a party. In another case involving a construction loan, the complaint alleged that the engineer's negligence, in performing inspections and rendering reports on work completed, caused the mortgagee to overpay loan proceeds to the developer-mortgagor. Reversing the lower court, a Florida appeals court held that it was reasonably foreseeable that the mortgagee would rely on the certifications and that negligent certification could, therefore, injure the mortgagee. *See Hobbs v. Florida First National Bank*, 406 So.2d 63 (Fla.Dist.Ct. App.1981).

In this case, uncontradicted testimony established the existence of the construction professional's duty. Expert testimony by Terrien established that meetings, like the December 20 meeting, between the Bank, the Developers and construction professionals are typical in the construction industry. Tr. Vol. II at 63. This type of meeting provides "an opportunity for the parties, especially the financing agent, to get to know the scope of the project, to get to know each other, to identify to what extent the budget ... is solid and what areas the budget might be vulnerable." Tr. Vol. II at 63–64. In Ter-

rien's opinion, the purpose of the meetings for the financing agent was to gain a sufficient level of comfort on which to close the loan and to proceed with the project. Tr.Vol. II at 64. The testimony established that construction professionals generally are fully aware of the underlying purpose of meeting with the lender. Tr.Vol. II at 64. Moreover, McCormick stated to all those present what the meeting's purpose would be. Tr.Vol. I at 228–29, 373.

Terrien opined that construction professionals, including engineers and construction managers, have a responsibility to correct any misinformation, to disclose the absence of any familiarity with information, and to inform the Bank, if necessary, that estimating services which a bank would reasonably expect had not been undertaken. Tr. Vol. II at 67. He went on to conclude that it is incumbent on the design professional to speak out. Tr.Vol. II at 87. Terrien also testified that construction professionals have an absolute obligation to clarify their involvement or lack of involvement in the project. Tr.Vol. II at 71. McCormick and Russo confirmed that in their experience, design and construction professionals are expected to give them truthful information and bring to their attention any inaccuracies in the information presented. Tr.Vol. I 79, 217–18, 257. Finally, Ray acknowledged the existence of a duty to be honest in communications with the Bank despite the lack of a contractual relationship. Tr.Vol. I at 308.

The testimony in this case underscored the responsibilities of construction and design professional when giving information to lenders. After careful review of all the evidence in this case, the Court concludes that under these circumstances, Engineering and Construction Management owed a duty of care to the Bank; this duty included being honest when making representations to the Bank regarding the accuracy of the construction budget.

As discussed above, Engineering and Construction Management breached their duties when they made affirmative misrepresentations to the Bank regarding the project's budget and overall feasibility. These actions on the part of Defendants lulled the Bank

into a false sense of financial security about this project. It was reasonable under these circumstances for the Bank to rely on Engineering and Construction Management's assurances about the accuracy of the Schedule B budget. Relying on the assurances of Engineering and Construction Management, the Bank went forward with the loan. Accordingly, the Court finds Construction Management, Engineering and Donald LaRochelle negligent in their professional dealings with the Bank.

## C. CONTRIBUTORY NEGLIGENCE

■ Defendants contend that the Bank was negligent in its lending practices in this case. Aliberti, LaRochelle & Hodson Engineering Corporation, Inc. and Donald LaRochelle's Post–Trial Brief (Docket No. 78) at 18; Post–Trial Brief of AL & H Construction Management, Inc. (Docket No. 79) (adopting the post-trial brief of Engineering). First, Defendants argue that the Bank was negligent in "failing to obtain some level of proof that the Developers had the funds available to cover the soft costs and hard cost overruns for this project." *Id.* at 18.

There was some evidence that the Bank did not plan for the prospective problems in this project. Specifically, Russo testified that he would not go into any project without something in the budget for contingency and that there were no contingencies built into the budget for this project. Tr.Vol. I at 254–55. Defendants, however, failed to establish that the Bank did not use reasonable care in extending the loan. Defendants presented no testimony, expert or otherwise, from which the Court could conclude that lenders should require borrowers to show proof that they have sufficient funds available to finish a project. The only testimony on this issue was that it is customary to have the Developer cover the soft costs. Tr.Vol. I at 212.

Throughout its brief, Engineering argues that if the Bank had adhered to the contingencies and conditions in the commitment letter, the "project would have had a chance at success." Aliberti, LaRochelle & Hodson Engineering Corporation, Inc. and Donald LaRochelle's Post–Trial Brief at 4. The Defendants argue that by waiving the requirements of a guaranteed, fixed price construction contract with a bonded firm, the Bank "doom[ed] the project to failure." *Id.* at 4. The Court finds that Defendants did not introduce sufficient evidence to support this theory of contributory negligence.

■ When the commitment letter was drafted, the Bank understood that the project was proceeding with a general contractor for a fixed price. Ex. 44; Tr. Vol. I at 63. At the December 20 meeting, however, Defendants explained to the Bank that this was not a fixed price contract but, rather, a fast-track project with a construction manager. Tr.Vol. I at 483. Therefore, there would not be a fixed price or a bond provided.[20] Tr. Vol. I at 483. The Defendants explained that the Bank should not be concerned about the absence of fixed-price contracts because of the flexibility in controlling costs and scheduling that their involvement would bring to the project. Tr.Vol. I at 482–83. The Defendants, themselves, played a direct role in persuading the Bank to waive the conditions in the commitment letter and, therefore, are estopped from asserting that the waiver of these conditions was a cause of the project's failure. *See Waterville Homes, Inc. v. Maine Dept. of Transportation,* 589 A.2d 455, 457 (Me.1991) (citing *Anderson v. Commissioner of Dept. of Human Services,* 489 A.2d 1094, 1099 (Me.1985) ("estoppel bars the assertion of the truth by one whose misleading conduct has induced another to act to his detriment in reliance on what is untrue")).

The commitment letter also required the Developer to place $600,000 in the Bank's control one week before closing. Ex. 44 ¶ 14. This money was to ensure the purchase of

---

20. Other requirements from the commitment letter were also waived by the Bank due to the nature of the construction project. Those conditions include: the requirement that loan proceeds will not be disbursed until final plans and specifications for the construction are approved, Ex. 44 ¶ f; Tr.Vol. I at 120; the Developer providing a construction timetable prior to closing, Ex. 44 ¶ g; Tr.Vol. I at 120; a disbursement schedule or a budget complete with cost estimates documented with firm contractor bids, Ex. 44 ¶ g. All of these requirements are directly related to the change to a construction management nature of the project.

the land.[21] Tr.Vol. I at 135–136. This money was never received by the Bank. Instead, the $600,000 was provided for by way of owner-based financing for the purchase of the land. Tr.Vol. I at 81, 136. The Court does not think this evidence amounts to negligent lending practice. The Bank was going to have the same value cushion and priority in the property no matter the source of the $600,000. Tr.Vol. I at 82, 213–14.

Finally, the commitment letter required the Developer to provide evidence to the Bank that $300,000 had already been spent on the project. Ex. 44 ¶ 14; Tr.Vol. I at 142–43. Defendants contend that the Bank's failure to confirm the expenditure of $300,000 for precommitment construction expenses contributed to the project's demise. The list of expenditures provided by the Developer cover the Laurentian and Rainbow/Seabreeze projects. Tr.Vol. I at 144; Ex. 48A. The expenditures run from March 1988–October 1988. Ex. 48A; Tr.Vol. I at 144. The Bank reviewed the list of expenditures and concluded that the $300,000 requirement was met. Tr.Vol. I at 36, 146, 148–49. Defendants point out that the list of expenditures includes many items not spent for the Rainbow/Seabreeze project. Tr.Vol. I at 199; Ex. 48A. However, after careful review, the Court concludes the Bank was justified in finding that more than $300,000 had been spent by the Developers on the Rainbow/Seabreeze project.

### D. JOINT AND SEVERAL LIABILITY

■ The FDIC suggests that Defendants should be held liable for the acts and omissions of each others' principals under a joint venture theory, under principles of agency, or under a theory of estoppel. FDIC's Post–Trial Brief (Docket No. 77) at 23–24. "The companies ignored the distinction between them, and often acted in tandem and on each others' behalf both generally, and in their wrongful behavior." *Id.* Defendants counter that Engineering and Construction Management neither intended to become joint venturers, nor did they act in a way which is

consistent with participants of a joint venture. Aliberti, Hodson & LaRochelle Engineering Corporation, Inc. and Donald LaRochelle's Post–Trial Brief (Docket No. 78) at 23. The Court concludes that the acts of Construction Management, Engineering and LaRochelle constitute a joint venture and that they are jointly and severally liable for the injury caused by the venture.

■ Maine law provides that:

A joint venture is an association between two or more individuals or entities who agree to pool their efforts and resources to jointly seek profits.... Such a contract may be express or implied, and the finder of fact must consider the conduct of the parties and the surrounding circumstances before reaching a conclusion as to their intent.

*Nancy W. Bayley, Inc. v. Maine Employment Security Commission,* 472 A.2d 1374, 1377 (Me.1984). *See also Inhabitants of City of Saco v. General Electric Co.,* 779 F.Supp. 186, 191 (D.Me.1991). The basic elements of a joint venture are community of interest and participation in the benefits or profits. *Simpson v. Richmond Worsted Spinning Co.,* 128 Me. 22, 30, 145 A. 250 (1929). "A joint venture is a business association by which two or more entities or persons pool their property, money, efforts, skill, or knowledge to jointly seek profits." *Honeycomb Systems, Inc. v. Admiral Ins. Co.,* 567 F.Supp. 1400, 1409 (D.Me.1983). "[A] writing is not indispensable to the creation of [a joint] venture." *Nancy W. Bayley,* 472 A.2d at 1377.

The evidence in this case indicates that there was substantial overlap with respect to the personnel, services, and pecuniary interests of Construction Management and Engineering. Ray acted on behalf of Construction Management throughout the project, while he was president of Construction Management and on the board of directors of Construction Management, Engineering and the holding company, AL & H Professional Associates. Tr.Vol. I at 285; Ex. 98 (letter

---

21. The Bank was financing $650,000 of the $1,250,000 purchase price of the land. Tr.Vol. I at 134–36. The commitment letter contemplated

that the remaining $600,000 would be provided by the Developer. Tr.Vol. I at 136, Ex. 44 ¶ 14.

from Engineering to the Developer regarding payment schedule—LaRochelle writes that in his absence "Ray will be available to discuss our concerns with you"). Similarly, LaRochelle who represented Engineering, was chair of the board of AL & H Professional Associates, Construction Management, and Engineering. Tr.Vol. II at 2–3. LaRochelle also served as president of AL & H Professional Associates. Tr.Vol. II at 3. Aliberti was president of Engineering and was a shareholder and CEO of AL & H Professional Associates. Ex. 2. In addition, Construction Management and Engineering shared the same building, administrative staff, and receptionist. Tr.Vol. I at 285–86.

There was also an overlap of services between Engineering and Construction Management. Tr.Vol. II at 9. On at least one occasion, Engineering sent a letter to the Developer regarding this overlap. Ex. 4; Tr.Vol. I at 432. A letter, on Engineering stationary, discussed fees for both Construction Management and Engineering, referring to both companies as the composite "AL & H".[22] Exs. 40, 41; Tr.Vol. II at 10–13. When Aliberti drafted a letter to the Bank, it was discussed by LaRochelle and Beaudette, who put his comments on it. Ex. 141; Tr. Vol. II at 28–29.

Representatives of both Construction Management and Engineering shared information about the venture. Beaudette testified that on December 14, 1988, he discussed with both Ray and Aliberti the inadequacy of the $918,000 budget. Tr.Vol. I at 456–59. Later, in the presence of LaRochelle, Beaudette discussed this issue directly with the Developer. Tr.Vol. I at 461–63. In addition, each

marketed the other's services and worked on the other's behalf. LaRochelle, as representative of Engineering, made a presentation to the Developer to solicit its engagement of Construction Management. Tr.Vol. I at 294–95; Tr. Vol. II at 5–9; Tr.Vol. III 33–35. When the Developer decided to use Construction Management, LaRochelle signed the contract and the latter addendum on behalf of Construction Management. Ex. 22; Tr.Vol. II at 10–12.

### III. DAMAGES

■ The parties disagree about the amount of damages in this case. Because this is, in effect, an action to recover on a promissory note, secured by a mortgage on real estate, the outer limit of liability is circumscribed by the amount of principal and interest owed on the note to the Bank as of the date of the foreclosure sale. The parties have stipulated that this amount is $1,384,948.53. Tr.Vol. II at 43–44. Careful consideration of the parties' legal argumentation leads the Court to conclude that damages should be determined by this amount less the fair market value (hereinafter "FMV") of the property on the date of foreclosure sale.[23]

At trial two expert appraisers, Robert E. Royal and Patricia M. Amidon, testified as to the FMV of the property, and each of their reports was admitted in evidence. Ex. 158, 185. The appraisal reports differed in a number of respects, most notably the wide discrepancy between their assessments of the property's value. In October 1989, just prior to the foreclosure sale, Royal, hired by the Bank, determined that the FMV of the prop-

---

22. LaRochelle testified that the letters "AL & H" are sometimes used to refer to either Engineering or Construction Management. Tr.Vol. II at 13. See also Ex. 173, 174, answers 7(e).

23. Plaintiffs' argue that the Bank should be bound by its $951,000 bid it made at the foreclosure sale and estopped from asserting that its bid did not reflect the fair market value of the property. Post–Trial Reply of AL & H Construction Management, Inc. (Docket No. 82) at 6–8. The Court has considered this argument and concludes that in this case the Bank should not be bound by its bid at the foreclosure sale.

Fair market value is defined in *Black's Law Dictionary* (5th ed. 1979) as "[t]he amount at which property would change hands between a

willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." It has also been defined to mean "the price an item of a particular make, model, size, style, material or condition will sell for on the open market in the geographic area involved." *Roy v. Commissioner, Department of Human Services,* 489 A.2d 499, 501 (Me.1985). Considering the deteriorating real estate market at the time of the foreclosure sale and the Bank's need to cover its investment, the foreclosure sale price did not result from a bona fide bargaining between a well-informed buyer and seller under no compulsion to purchase the property.

erty was $1,600,000 and the liquidation value of the property was $960,000. Ex. 185. In May 1993, Amidon determined that the FMV of the property on the date of foreclosure was $295,000. Ex. 158. At the foreclosure sale, the Bank decided to bid the liquidation value for the property as assessed by Royal and purchased the property for a credit bid of $951,000. Tr.Vol. I at 182, 223.

 The Court finds that there are errors in the calculation of the FMV of the subject property in both appraisals.[24] In addition, the appraisals are inconsistent in a number of respects, including the use of different square footage figures for the same property. This is, of course, crucial information for employing the sales comparison approach in order to determine the value of the subject property. Furthermore, Amidon's appraisal was done with the benefit of hindsight. In 1992, she was able to assess the full extent of the deterioration of the real estate market in southern Maine.

Maine law provides that it is not necessary for "[t]he court ... [to] accept in full or in part the conclusions of the independent appraisers who testify as to the fair market value of the mortgaged property." *Kennebec Savings Bank v. Chandler*, 447 A.2d 824, 826 (Me.1982). For purposes of establishing the FMV of the property on the date of the foreclosure sale, the Court has evaluated and weighed the expert appraisal reports and the data which support them. Based upon this lengthy review of the testimony at trial, the appraisals, and the data upon which the appraisals are based, the Court concludes that the fair market value of the property on the date of foreclosure was $908,000.

---

**24.** The errors in Amidon's appraisal include the use of a property located at 210 East Grand Avenue in Old Orchard Beach in her determination of unit value. Amidon concluded that this sale was "most like the subject in terms of location and market conditions" and was, therefore, given the most weight in determining the unit value per square foot. Ex. 158 at 36, 40. This sale should not have been included in Amidon's calculation of unit value or, in any event, not weighted so heavily in the calculation. This property has only 50 feet of road frontage, making it incapable of being developed as a motel, hotel, or condominium complex under Old Orchard Beach zoning requirements. Ex. 27, 38.

Having considered the above matters and reviewed the record and the submissions of the parties, it is hereby *ORDERED* and *ADJUDGED* that judgment enter for Counterclaim Plaintiff, the FDIC, and against Counterclaim Defendants, AL & H Construction Management and AL & H Engineering, and Third–Party Defendant Donald LaRochelle jointly and severally on the claims of negligence and negligent misrepresentation in the amount of Four Hundred Seventy–Six Thousand Nine Hundred Forty–Eight Dollars and Fifty–Three Cents ($476,948.53).

The Court concludes that this piece of property's potential use is dissimilar to the subject property and, therefore, the sale should not have been included in Amidon's calculation of unit value.

The most glaring mistake that the Court finds in Royal's appraisal is the method for valuation of the property. Royal employed the market value method of determining price based on the sales of comparable properties. Royal based his valuation on the unit of comparison of dollars per buildable unit. The Court concludes that the price per buildable unit is not an acceptable method of valuation in a depressed real estate market, like the one in southern Maine at the time of the foreclosure sale. Tr.Vol. II at 223.